

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José C. Llorens, et al.<br>      Recurridos<br><br>                  v.<br><br>Rafael Arribas, Jr., et al.<br>      peticionarios<br><br>Pharmaceutical Developers, Inc.<br>      Parte Interventora<br>      Peticionaria | Certiorari<br><br>2011 TSPR 204<br><br>184 DPR ____ |

Número del Caso:   CC-2009-497

Fecha: 20 de diciembre de 2011

Tribunal de Apelaciones:

                Región Judicial de San Juan, Panel III

Juez Ponente:      Hon. Bruno E. Cortés Trigo

Abogados de la Parte Peticionaria:

                Lcdo. Fernando J. Gierbolini
                Lcda. Nilda M. Joglar Irizarry

Abogados de la Parte Recurrida:

                Lcdo. Roberto Boneta
                Lcdo. Ernesto Blanes

Materia: Petición de Disolución Corporativa (Artículo 9.03 de la Ley General de Corporaciones)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EL TRIBUNAL SUPREMO DE PUERTO RICO

José C. Llorens, *et al.*
Recurridos

v.

Rafael Arribas, Jr., *et al.*
Peticionarios

Pharmaceutical Developers,
Inc.
Parte Interventora
Peticionaria

*Certiorari*

CC-2009-497

Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 20 de diciembre de 2011.

Este caso nos brinda la oportunidad de analizar la figura de la "empresa común" o *"joint venture"* establecida por la Ley General de Corporaciones de 1995. En particular, interpretaremos por primera vez el artículo 9.03 de dicha Ley que provee para la disolución de corporaciones compuestas por dos accionistas que por partes iguales se dedican a la realización de una empresa común. Por las razones que ofrecemos a continuación, confirmamos la determinación del Tribunal de Apelaciones.

I.

El 2 de agosto de 2006, el señor José C. Lloréns presentó una demanda ante el Tribunal de Primera Instancia contra el señor Rafael Arribas al amparo del artículo 9.03 de la Ley General de Corporaciones de 1995, solicitando la disolución de la corporación Pharmaceutical Generics Developers, Inc. (PGD).[1] Lloréns y Arribas son los únicos accionistas de PGD y cada uno posee el 50 por ciento de las acciones de dicha corporación. PGD es una corporación que se dedica a la venta y distribución de productos farmacéuticos genéricos. Según Llorens, entre él y Arribas existen diferencias significativas que provocan un tranque que impide la operación de la empresa, por lo que procede la disolución del ente corporativo conforme al artículo 9.03.[2]

Lloréns solicitó que se dictase sentencia sumaria a su favor, argumentando que no había controversia real sobre los siguientes hechos materiales: (1) que PGD es una corporación organizada bajo las leyes de Puerto Rico, (2) que Arribas y él son los únicos accionistas de PGD, cada cual con el 50 por ciento de las acciones y (3) que existen desavenencias entre ellos que han provocado un tranque

---

[1] Igualmente presentó, como exige el artículo 9.03, un Plan de Disolución Corporativa.

[2] Originalmente, la demanda fue presentada a nombre del señor Lloréns y de PGD. Posteriormente, el señor Lloréns solicitó que se enmendara la demanda a los fines de eliminar a PGD como parte demandante y convertirla en parte demandada. Por su parte, PGD solicitó intervención en el pleito, lo que fue autorizado por el foro de instancia.

insalvable.[3] Por su parte, Arribas y PGD sostienen que el artículo 9.03 no aplica a PGD en la medida que ésta no podía considerarse una "empresa común",[4] uno de los requisitos para que se pueda poner en vigor dicho artículo. Por tanto, solicitaron la desestimación de la demanda por no justificarse la concesión de un remedio. De igual forma, la parte demandada se opuso a la moción de sentencia sumaria presentada por Lloréns alegando que, de aplicar el artículo 9.03, había controversia real sobre varios hechos que considera materiales; entre estos: (1) si Arribas fue empleado de Lloréns, (2) la cantidad de capital aportado por cada uno cuando se incorporó PGD, (3) si existen controversias insalvables entre los accionistas, (4) si PGD está actualmente operando, (5) las razones para el alegado tranque y (6) si PGD se creó como una corporación para una sola transacción o gestión comercial.[5]

El Tribunal de Primera Instancia declaró sin lugar la moción de sentencia sumaria presentada por Lloréns por entender que había controversia sobre hechos materiales del caso. De igual forma, declaró sin lugar la moción de desestimación presentada por Arribas y PGD. Si bien

---

[3] Lloréns también alega que esas desavenencias provocaron su renuncia como director y oficial de PGD.

[4] Como veremos, el artículo 9.03 de la Ley General de Corporaciones únicamente aplica a corporaciones cuyos accionistas se dedican al logro de una empresa común.

[5] Esta última controversia es exclusivamente de derecho y es una reafirmación de la alegación de la parte demandada de que el artículo 9.03 no es aplicable, por lo cual sostiene no se justifica la concesión de un remedio y procede la desestimación de la demanda.

coincidió con la parte demandada en que PGD no era una corporación dedicada a una empresa común y, por ende, la controversia no estaba contemplada por el artículo 9.03, el foro de instancia concluyó que, bajo el estándar de una moción de desestimación en la que se argumenta que no se configura una causa de acción que justifique la concesión de un remedio, el caso debía continuar, ya que Lloréns podía tener derecho a otro remedio en ley que no fuera el establecido en el artículo 9.03.[6]

Ambas partes acudieron al Tribunal de Apelaciones. Lloréns alegó que procedía dictar sentencia sumaria y la disolución de PGD, conforme al artículo 9.03 de la Ley General de Corporaciones. A su vez, Arribas y PGD alegaron que, una vez resuelto que el artículo 9.03 no aplicaba, se debió haber desestimado el caso, ya que la solicitud de disolución se fundamentaba en dicha disposición. Tras consolidar ambos recursos, el foro apelativo revocó al Tribunal de Primera Instancia.

Según el Tribunal de Apelaciones, no había controversia real en cuanto a los hechos materiales del caso. Concluyó de entrada que la única controversia de hechos respecto a la acción al amparo del artículo 9.03 de la Ley General de Corporaciones se centraba en el requisito de que la corporación se dedique al logro de una empresa

---

[6] En particular, el foro de instancia hizo referencia a la disolución de una corporación compuesta por dos accionistas con igual cantidad de acciones, como remedio en equidad reconocido en Epstein v. F & F Mortgage Corp., 106 D.P.R. 211 (1977).

común ("joint venture").[7] El Tribunal de Apelaciones razonó que hay dos posibles definiciones de lo que constituye una empresa común bajo el artículo 9.03. Una posible definición es que la corporación se crea para efectuar únicamente una sola transacción comercial. La segunda posibilidad, de corte más amplio, incluye aquellas entidades que se dedican a un negocio continuo que trasciende una única transacción, como sucede en el caso de PGD que se dedica a la venta de productos farmacéuticos. El foro apelativo acogió la segunda alternativa,[8] al razonar que la decisión en Planned Credit of P.R., Inc. v. Page,[9] limitando la "empresa común" a la realización de "una sola transacción", no rige en la presente situación pues ese caso fue resuelto antes de que la Ley General de Corporaciones de 1995 codificara dicha figura por primera vez. Según el Tribunal de Apelaciones, la interpretación ofrecida por Arribas y PGD "conllevaría llegar al resultado irrazonable de que la intención

_____

[7] El foro intermedio no encontró controversia en cuanto a los siguientes hechos materiales (1) que la corporación está organizada con arreglo a las leyes del Estado Libre Asociado de Puerto Rico, (2) que tiene sólo 2 accionistas, cada uno de los cuales posee el 50 por ciento de las acciones de la misma, y (3) que hay desavenencia en torno a la deseabilidad de continuar tal empresa común.

[8] El foro apelativo también recurrió a la jurisprudencia del estado de Delaware, de donde se importó nuestra Ley General de Corporaciones de 1995, y los elementos allí identificados de lo que constituye una empresa común. Según el Tribunal de Apelaciones, la definición adoptada se asemeja más a los fallos de los tribunales de Delaware sobre qué constituye una empresa común. En particular, el foro apelativo notó que en dicha jurisdicción se ha rechazado la interpretación de que un "joint venture" se limita a una sola transacción comercial.

[9] 103 D.P.R. 245 (1975).

legislativa fue promulgar una disposición tan limitada que aplica solamente a corporaciones organizadas para efectuar una única transacción comercial".[10] Al no haber controversia de que PGD era una corporación dedicada únicamente a la venta y distribución de farmacéuticos genéricos, y que los demás hechos controvertidos por la parte demandada no están relacionados con los requisitos del artículo 9.03, el Tribunal de Apelaciones dictó sentencia sumaria ordenando la disolución de PGD y devolvió el caso al Tribunal de Primera Instancia para que continuara con el proceso establecido en el artículo 9.03.

Inconformes, Arribas y PGD presentaron un recurso de *certiorari* ante este Tribunal. En su petición, se reafirman en que PGD es un negocio que lleva a cabo múltiples gestiones comerciales y tiene una existencia continua, por lo cual no constituye una empresa común según la definición adoptada en Planned Credit y no puede disolverse siguiendo el procedimiento pautado en el artículo 9.03. Además, alegan que el foro apelativo erró al ordenar sumariamente la disolución de PGD pues ese no era el procedimiento dispuesto por dicho artículo.

Arribas y PGD nos refieren a nuestra decisión en Planned Credit, que, según exponen, definió los contornos de la "empresa común" como una entidad que realiza una única transacción y tiene un fin específico y restringido, por lo que no puede tener naturaleza continua. Por tanto, sostienen que el Tribunal de Apelaciones erró al recurrir a

---

[10] Sentencia del Tribunal de Apelaciones, p. 12.

la normativa de Delaware para adoptar una definición distinta y más abarcadora de dicha figura. Según los peticionarios, PGD no es una empresa común porque se dedica al negocio de venta y distribución de farmacéuticos genéricos a perpetuidad y no a un fin específico y restringido, es decir, a una sola transacción. En particular, alegan que la definición amplia adoptada por el Tribunal de Apelaciones convierte en una empresa común a toda corporación regular compuesta por dos accionistas que sean dueños, cada cual, del 50 por ciento de las acciones. Arguyen que, en ese caso, no tendría sentido el artículo 9.03. Por tanto, Arribas y PGD plantean que cuando la Asamblea Legislativa hizo mención a la "empresa común" en el artículo 9.03, sin ofrecer una definición estatutaria de dicha figura, adoptó la definición provista en Planned Credit. Finalmente, los peticionarios alegan que los Artículos de Incorporación de PGD ni siquiera la limitan a la venta y distribución de medicamentos genéricos, sino que la corporación puede dedicarse a cualquier actividad lícita. Según su criterio, esto impide que pueda catalogársele como empresa común dedicada a una sola transacción o, incluso, a una sola gestión comercial.[11]

En la alternativa, Arribas y PGD insisten en que, aun siendo aplicable el artículo 9.03, la sentencia sumaria es improcedente, pues hay controversia en cuanto a los

---

[11] No obstante, no hay controversia alguna de que, en la práctica, PGD se dedica única y exclusivamente a la venta y distribución de farmacéuticos genéricos. Todos los documentos presentados por ambas partes sostienen esta determinación.

siguientes hechos: (1) la existencia de diferencias insalvables entre Lloréns y Arribas, (2) si PGD se encuentra actualmente operando, (3) las razones para el alegado tranque y (4) si PGD se creó como una corporación para una sola transacción comercial o gestión comercial.[12] Según Arribas, si se decide aplicar el artículo 9.03, lo que correspondería sería devolver el caso al foro de instancia para la celebración de una vista en la que se diluciden los hechos señalados. Los peticionarios sostienen que cuentan con varias defensas afirmativas que impiden la disolución sumaria de PGD. En particular, aducen que la petición de disolución constituye un incumplimiento de los deberes de fiducia de Lloréns hacia PGD.[13] De igual forma, Arribas y PGD alegan que Lloréns tiene otra corporación que es competidora de PGD y no se debe permitir que éste logre la disolución de PGD para engrosar las arcas corporativas de su otra empresa.[14]

Por su parte, Lloréns alega que procede la disolución de PGD pues están presentes todos los elementos y se han cumplido todos los pasos requeridos por el artículo 9.03. Sostiene que PGD debe considerarse una empresa común,

---

[12] Como adelantáramos, este último hecho alegadamente en controversia es una reafirmación de la posición de Arribas y PGD de que el artículo 9.03 no es de aplicación a PGD.

[13] Incluso, Arribas presentó una demanda contra Lloréns por un alegado incumplimiento con su deber de fiducia que causó daños a PGD. KAC 2006-4735 (901).

[14] Arribas y PGD sostienen que según la normativa de Delaware, este tipo de defensa en particular se ha utilizado para declarar sin lugar una petición de disolución.

incluso bajo la definición de Planned Credit, pues nuestra decisión en ese caso realmente no limita la empresa común a una sola transacción. En particular, alega que en aquel caso nos equivocamos al traducir el término "single business enterprise", utilizado en la doctrina de los Estados Unidos, como "una sola transacción". Lloréns sostiene que PGD cae bajo la categoría de un "single business enterprise", ya que se dedica únicamente a la venta y distribución de farmacéuticos genéricos.[15] Arguye, además, que si las corporaciones dedicadas al logro de una empresa común tienen, por definición, que dedicarse a "una sola transacción", el procedimiento de disolución provisto por el artículo 9.03 sería innecesario porque no habría nada que disolver, como tampoco se daría una desavenencia entre los accionistas sobre la continuación de unas operaciones que, por definición, nunca serían continuas. En la alternativa, alega que aun si no aplica el artículo 9.03, procede la disolución de PGD como remedio en equidad, según nuestras expresiones en Epstein v. F & F Mortgage Club.[16]

---

[15] De igual forma, se sostiene en que no estamos obligados por la definición adoptada en Planned Credit, pues éste se resolvió previo a la aprobación de la Ley General de Corporaciones. Lloréns insiste en que debemos interpretar la figura de "empresa común" al palio de la normativa de Delaware de donde se importó textualmente nuestro artículo 9.03. Según el recurrido, en Delaware se aplica la sección análoga al artículo 9.03 a negocios en marcha y no meramente a entidades que llevan a cabo una sola transacción.

[16] 106 D.P.R. 211 (1977).

En cuanto a la sentencia sumaria, Lloréns alega que el artículo 9.03 es, precisamente, un procedimiento sumario de disolución de una corporación. Por tanto, una controversia de hecho será material a una demanda bajo el artículo 9.03 si versa sobre uno de los cuatro requisitos enumerados en dicho estatuto, a saber: si PGD es una corporación organizada bajo las leyes de Puerto Rico, si está compuesta por dos accionistas cada uno con el 50 por ciento de las acciones, si se dedica al logro de una empresa común y si existen desavenencias entre éstos sobre la deseabilidad de descontinuar las operaciones. Por tanto, Lloréns concluye que cualquier controversia sobre las <u>razones</u> para las desavenencias es impertinente. De igual forma, como no hay controversia de hecho sobre las operaciones de PGD, sólo resta estimar, como cuestión de derecho, si dichas operaciones caen bajo el significado de "empresa común". De estimarse que PGD es una empresa común, procede su disolución inmediata. El 11 de diciembre de 2009 expedimos el auto de *certiorari*. Las partes han comparecido y pasamos a resolver.

II.

El artículo 9.03 de la Ley General de Corporaciones de 1995 establece un mecanismo expedito para la disolución de corporaciones dedicadas a una empresa común compuestas por dos accionistas con igual cantidad de acciones:

> Disolución de una corporación de empresa común de dos accionistas.
>
> a) Si los accionistas de una corporación organizada con arreglo a las leyes del

Estado Libre Asociado de Puerto Rico, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se **dedicasen** al logro de una empresa común (joint venture), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y disponer de los activos utilizados en tal empresa de acuerdo con el plan que ambos accionistas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la corporación queda disuelta. La petición deberá acompañarse con una copia del plan de descontinuación y distribución que se propone y una certificación que haga constar que copias de tal petición y plan se han remitido por escrito al otro accionista y a los directores y oficiales de la corporación. La petición y la certificación serán suscritas y autenticadas según las disposiciones del art. 703 de esta ley.

b) Salvo en el caso en que ambos accionistas presenten ante el Tribunal de Primera Instancia (Sala Superior), dentro de tres (3) meses a partir de la fecha de la radicación de la petición, una certificación simultáneamente suscrita y autenticada en donde declaren que han acordado un plan, o una modificación del mismo, y presenten, dentro de un (1) año a partir de la fecha de radicación de tal petición, una certificación suscrita y autenticada en donde declaren que la distribución dispuesta por tal plan se ha completado, el Tribunal de Primera Instancia (Sala Superior) podrá disolver la corporación y podrá administrar y liquidar sus negocios mediante la designación de uno o más síndicos o administradores judiciales con todas las facultades y títulos de un síndico o

administrador judicial designado según el
artículo 9.09 de esta ley…[17]

Como se desprende de lo anterior, para que un tribunal pueda ordenar la disolución de una corporación bajo el artículo 9.03 tienen que darse los siguientes elementos: (1) que se trate de una corporación organizada con arreglo a las leyes de Puerto Rico, (2) que tenga sólo dos accionistas, cada uno con el cincuenta por ciento de las acciones, (3) que se dedique al logro de una empresa común y (4) que haya un desacuerdo entre los accionistas sobre la deseabilidad de descontinuar tal empresa común. Es decir, el artículo 9.03 no aplica a toda corporación compuesta por dos accionistas en la que cada uno posee la mitad de las acciones. Hace falta que dicha corporación se dedique a lograr una "empresa común". Sin embargo, en ninguna otra parte de la Ley se hace referencia al concepto de empresa común. Tampoco hay una definición estatutaria de esta figura.

---

[17] 14 L.P.R.A. § 3003 (derogado) (Énfasis suplido). La Ley General de Corporaciones de 2009, Ley 164 de 16 de diciembre de 2009, 14 L.P.R.A. §§ 3502-4066, derogó la Ley General de Corporaciones de 1995. No obstante, en cuanto al proceso de disolución de una corporación dedicada a una empresa común, la nueva ley de corporaciones preservó el mecanismo dispuesto en la ley anterior. Incluso, mantuvo su misma designación (artículo 9.03, 14 L.P.R.A. § 3703). La única diferencia entre ambos artículos es la adición en la nueva ley de una frase introductoria en el artículo 9.03 que permite a los accionistas pactar, ya sea en el certificado de incorporación o mediante acuerdo escrito a esos efectos, que no será aplicable dicho artículo. Como veremos, este cambio responde al desarrollo de la normativa sobre derecho corporativo en el estado de Delaware. Por tanto, la solución de esta controversia es idéntica bajo la Ley General de Corporaciones de 1995 como la de 2009.

Con la aprobación de la Ley General de Corporaciones de 1995 se codificó por primera vez el concepto de "empresa común" en nuestro ordenamiento, se le dio forma corporativa y se adoptó un mecanismo estatutario para la disolución de una corporación dedicada a una empresa común. Previo a ello, nuestra jurisprudencia ya había analizado, por separado, tanto la figura de la empresa común como la disolución de corporaciones compuestas por dos accionistas por partes iguales.[18] Sin embargo, precisamente porque son decisiones anteriores a la aprobación del estatuto que venimos llamados a interpretar hoy, tenemos que evaluar y sopesar ambas opiniones con mucha cautela.

En Planned Credit of P.R., Inc. v. Page, al discutir la figura de la sociedad, analizamos la "empresa común" en su manifestación no corporativa.[19] Reconociendo que "a veces resulta difícil distinguir entre una sociedad y una empresa común", en dicho caso resolvimos que la característica

---

[18] Hasta ahora, nuestra jurisprudencia no había discutido la interacción entre la figura de la empresa común y la disolución de una corporación compuesta por dos accionistas por partes iguales. Por el contrario, las habíamos analizado separadamente: Planned Credit of P.R., Inc. v. Page, supra (empresa común) y Epstein v. F & F Mortgage Corp., supra (disolución de una corporación compuesta por dos accionistas).

[19] A partir de 1995 y para efectos del artículo 9.03, la Asamblea Legislativa dio forma corporativa al concepto de empresa común. Esta distinción es significativa, ya que el análisis en Planned Credit se basó en que la figura de la sociedad es más formal que la de la empresa común. Pero, al recibir forma corporativa en la Ley General de Corporaciones de 1995, la "empresa común corporativa" asumió una estructura jurídica con mayores formalidades y protecciones que la sociedad. Por tanto, no podemos confundir la empresa común en su forma no-corporativa con la empresa común que asume la forma corporativa al amparo de la Ley General de Corporaciones.

esencial de la empresa común es que se trata de "una operación limitada a <u>una sola transacción</u> [… y] [n]o se trata de una asociación convenida para operaciones diversas y de naturaleza continua, sino con un <u>fin específico y restringido</u>".[20]

A primera vista, el dedicarse únicamente a una sola transacción parecería ser una limitación inherente a la figura de la empresa común. Sin embargo, como adelantáramos, esta definición se limita <u>a la empresa común en su modalidad no-corporativa</u>. Además, <u>una mirada más profunda a nuestras expresiones en Planned Credit contradice una visión tan estrecha de la empresa común</u>, aún en su modalidad no-corporativa. Revisando esas expresiones, nos topamos con que la interrogante que confrontamos en ese caso era si una relación comercial particular entre las partes constituía una sociedad o una empresa común, pues, como hemos señalado, la ley de corporaciones vigente en aquel entonces <u>no reconocía que una empresa común pudiese tener una modalidad corporativa</u>. Por tanto, al analizar la distinción entre una sociedad y una empresa común, abordamos esta segunda figura partiendo de su naturaleza informal, carente de personalidad jurídica y demás características inherentes a un ente corporativo. En resumidas cuentas, la empresa común de <u>Planned Credit</u> es distinta a la entidad corporativa reconocida en el artículo 9.03.

---

[20] *Id.*, pp. 250-251 (Énfasis suplido).

Para interpretar nuestras expresiones en Planned Credit debemos recurrir a las fuentes doctrinales y normativas en las cuales descansamos, en particular la discusión del tratadista Rowley y su discusión sobre la figura de la empresa común en su modalidad no corporativa.[21] Este tratadista reconoce que la figura de la empresa común no permite una definición satisfactoria,[22] pero ofrece la siguiente definición: "An association of two or more persons to carry out a **single business enterprise** for profit".[23] La Opinión en Planned Credit tradujo esta definición y citando como autoridad a Rowley, definió la empresa común como: "una operación limitada a una sola transacción".[24] Resulta evidente el error, pues "single business enterprise" trasciende los límites de una sola transacción. Por eso, la traducción correcta del enunciado de Rowley es: "Una asociación de dos personas o más para llevar a cabo una **empresa de un solo negocio** para obtener

---

[21] Rowley on Partnership, Vol. 2, 1960 ed.

[22] Id, § 52.2, p. 464. "The relationship of a joint adventure does not readily admit a short and satisfactory definition. The determination of the existence of a joint adventure must depend in each case on its particular facts […] Numerous definitions of a joint adventure have nevertheless been promulgated". Lo que es más, Rowley explica que, precisamente, la principal fuente de controversias en casos de empresas comunes es si existe tal empresa. "In probably a majority of all reported cases and definitely a majority of the earlier cases concerned with joint adventures, the existence of the relationship was a matter disputed by the parties and determined by the court, or a conclusion by the court without any such claim by any of the parties". Id, p. 475.

[23] Id. (Énfasis suplido).

[24] Planned Credit of P.R., Inc. v. Page, supra, p. 250.

ganancia". De esa manera, la empresa común no corporativa se asemeja a una sociedad, pero limitada en su alcance y duración.[25] Igualmente, sus elementos fundamentales son el compartir tanto las ganancias y las pérdidas, como el control de la empresa.[26]

Rowley descarta expresamente la limitación de la empresa común a una sola transacción: "[A] joint adventure is usually, but not necessarily, limited to a single transaction".[27] Es decir, una empresa común puede estar dedicada a una sola transacción, pero no tiene por qué limitarse a ello. Pero incluso en los casos de empresas dedicadas a una sola transacción, dicha transacción no tiene que ser de duración corta, sino que puede tardarse años en concluir.[28] Por tanto, la característica esencial de la empresa común no es que la gestión se dedique a una sola transacción. Por el contrario, el elemento fundamental de la empresa común es que tenga un objetivo o fin específico.

Por su parte, el profesor Díaz Olivo discute la figura de la empresa común al abordar el proceso de disolución bajo el artículo 9.03. En ese contexto, el profesor propone lo siguiente:

---

[25] *Id*, pp. 464-465.

[26] *Id*, p. 475.

[27] *Id*, p. 482 (Énfasis suplido).

[28] *Id*, pp. 482-483. "The single transaction or venture that is the subject matter of the relationship may not be brief in duration. It may take years to terminate […] [T]he duration of the venture […] is […] seldom a given or stated period of time".

> Una empresa común es la realización de una **operación** comercial **específica** llevada a cabo por dos o más personas. Los empresarios para esta operación o actividad aportan dinero, propiedad, conocimientos o servicios y comparten entre sí las ganancias y el riesgo de la gestión. La figura de la empresa común guarda gran similitud con la sociedad, con la diferencia de que ésta se organiza para operar un negocio de forma continua, <u>mientras que la empresa común lo hace para llevar a cabo una sola transacción **o gestión comercial**"</u>.[29]

Es evidente que en este comentario Díaz Olivo no se refiere a la empresa común que asume forma corporativa, sino a la que guarda similitud con la sociedad, es decir, la que estudiamos en <u>Planned Credit</u>. Sin embargo, sus expresiones reconocen que, aún en ese caso, si bien una empresa común puede dedicarse únicamente a una sola transacción, también puede dedicarse a realizar una <u>gestión</u> u <u>operación</u> comercial, lo que supone una relación de negocios que trasciende la mera transacción. También surge del comentario del profesor Díaz Olivo que el elemento fundamental de la empresa común es que los esfuerzos de la empresa estén dirigidos hacia la obtención de un fin específico previamente identificado por sus integrantes.

Hemos visto que el artículo 9.03 de nuestra Ley General de Corporaciones reconoce la empresa común en su modalidad corporativa dentro del marco de una corporación compuesta únicamente por dos accionistas por partes iguales. Nuestra jurisprudencia ha atendido la problemática de la disolución de este tipo de corporación cuando se produce un tranque irremediable entre sus accionistas. En <u>Epstein v. F & F</u>

---

[29] C. Díaz Olivo, <u>Corporaciones</u>, Publicaciones Puertorriqueñas, 2005, pp. 248-249 (Énfasis suplido).

Mortgage Corp., al confrontar la realidad de que el demandado y el demandante poseían las acciones de ambas corporaciones por mitad, reconocimos que "[n]inguno de ellos tiene el control necesario para hacer determinaciones unilaterales. Los conflictos existentes entre ellos parecen insalvables. No parecería justo que no hubiera un medio para zanjar sus posiciones encontradas sin que continuaran indefinidamente atados en la indivisión por la mera ficción corporativa".[30] Dado que la ley de corporaciones de 1956, vigente en ese momento, no proveía para la disolución de una corporación en esas circunstancias, recurrimos a la equidad pautada en el artículo 7 del Código Civil y ordenamos la disolución del ente corporativo.[31]

Como explica el profesor Negrón Portillo, "[l]a situación planteada en el caso Epstein fue atendida por la nueva Ley General de Corporaciones [de 1995]".[32] No obstante, como hemos visto, la Ley General de Corporaciones de 1995, al igual que la de 2009, únicamente provee para la disolución judicial cuando las corporaciones compuestas por dos accionistas, cada cual con igual cantidad de acciones, se dedican a una empresa común. Es para esos casos que habrá que recurrir al proceso establecido en el artículo 9.03 de la Ley General de Corporaciones. Cuando no aplique

---

[30] Epstein v. F & F Mortage Corp., *supra*, p. 217 (Énfasis suplido).

[31] *Id*, p. 221.

[32] L.M. Negrón Portillo, Derecho Corporativo Puertorriqueño, 2da ed., Ed. Situm, 1996, p. 396.

este artículo, es decir, cuando no se trate de una empresa común, se recurrirá a la doctrina de Epstein.

Si bien Planned Credit y Epstein facilitan nuestra interpretación del artículo 9.03 de la Ley General de Corporaciones,[33] resultan insuficientes. Por un lado, Planned Credit contiene una definición, que ya hemos precisado, de la figura de la empresa común no corporativa. Por otra parte, Epstein atiende la disolución forzosa de corporaciones compuestas únicamente por dos accionistas por partes iguales. Cada uno atiende una vertiente de la situación aquí planteada, pero ninguno de los dos nos brinda la solución en su totalidad. Por eso, en el contexto de una empresa común en forma de corporación, según establecido por la Ley General de Corporaciones, el propio estatuto nos obliga a auscultar otras fuentes. A la misma vez, el desarrollo histórico de la figura de la empresa común también requiere que actualicemos nuestro análisis realizado en 1975.

III.

La Ley General de Corporaciones de 1995 es una traducción de la Ley General de Corporaciones de Delaware. En particular, nuestro artículo 9.03 es un calco de la sección 237 de dicha ley.[34] Durante la consideración del

---

[33] En particular, tras haberse aclarado que nuestras expresiones en Planned Credit no limitaron la figura de la empresa común, incluso en su forma no corporativa, a una sola transacción comercial.

[34] 8 Del. C. § 273. Dicha sección dispone, en lo pertinente, como sigue:

Proyecto del Senado 1122, que eventualmente se convertiría en la Ley 144, el Informe de la Comisión de Reformas Gubernamentales de dicho foro legislativo estableció expresamente el mandato legislativo en cuanto a la interpretación de la Ley General de Corporaciones:

> Al tomar este camino, expresamos aquí <u>con meridiana claridad la intención legislativa de que, a efectos de la interpretación de esta ley, se utilicen como guías los preceptos y normas desarrolladas por la jurisprudencia interpretativa del estado de Delaware.</u>[35]

Por eso, ante el silencio legislativo sobre la definición de una empresa común en el contexto corporativo,

---

Dissolution of joint venture corporation having 2 stockholders

> (a) If the stockholders of a corporation of this State, having only 2 stockholders each of which own[s] 50% of the stock therein, <u>shall be engaged in the prosecution of a joint venture</u> and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture and disposing of the assets used in such venture, either stockholder may, unless otherwise provided in the certificate of incorporation or in a written agreement between the stockholders, file with the Court of Chancery a petition stating that it desires to discontinue such joint venture and to dispose of the assets used in such venture in accordance with a plan to be agreed upon by both stockholders or that, if no such plan shall be agreed upon by both stockholders, the corporation be dissolved…".

(Énfasis suplido).

[35] Comisión de Reformas Gubernamentales del Senado de Puerto Rico, Informe sobre el P. del S, 1122, p. 9 (Énfasis suplido). El informe expresó: "El proyecto sigue de cerca la legislación corporativa del estado de Delaware que, a través de los años se ha caracterizado por contar con una legislación corporativa abarcadora y de avanzada". *Id.*, p. 8.

debemos recurrir a la normativa de Delaware, tanto estatutaria como jurisprudencial.

En cuanto al proceso de disolución corporativa establecido en el artículo 9.03, el informe legislativo indica que: "se dispone para la disolución de una corporación con relativa facilidad, tanto bajo circunstancias especiales como en casos de tranques de corporaciones con sólo dos accionistas, como en circunstancias ordinarias cuando los accionistas decidan poner fin a las actividades corporativas".[36] Por tanto, también existe un mandato legislativo de interpretar el artículo 9.03 de la Ley General de Corporaciones de manera que facilite la disolución de una corporación cuando se produzca un tranque entre dos únicos accionistas o cuando así lo soliciten los accionistas en situaciones ordinarias.[37] Por su parte, la Ley General de Corporaciones de 2009, que como hemos visto mantuvo intacto, en lo pertinente, el artículo 9.03, también preservó la cercanía entre nuestro esquema estatutario y el desarrollo normativo en Delaware en el área de derecho corporativo. En particular, se reafirma la identidad entre nuestro artículo 9.03 y su análogo en la ley de Delaware (sec. 273) sobre la

---

[36] *Id*, p. 11. Esto es cónsono con la intención legislativa en cuanto a la Ley General de Corporaciones en su totalidad: "[U]no de sus objetivos principales [es] facilitar el tráfico mercantil". *Id*, p. 8.

[37] *Véase* Informe de la Comisión de Gobierno del Senado de Puerto Rico sobre el P. del S. 124. En dicho Informe, se explica que la nueva Ley General de Corporaciones es producto de los cambios que sufrió la ley de corporaciones de Delaware.

disolución de corporaciones dedicadas a una empresa común compuesta por dos accionistas con igual cantidad de acciones.[38]

Lo anterior es cónsono con expresiones previas de este Tribunal sobre los beneficios de recurrir a la normativa de Delaware para analizar nuestros esquemas estatutarios sobre derecho corporativo. En D.A.Co. v. Alturas Fl. Dev. Corp. y otro,[39] reconocimos que la Ley General de Corporaciones de 1956 entonces vigente se fundamentaba en la Ley General de Corporaciones del estado de Delaware y, por eso, otorgamos valor ilustrativo y persuasivo a las interpretaciones que los tribunales del estado de Delaware, al igual que otras jurisdicciones, hayan dado a las secciones correspondientes de la Ley General de Corporaciones de ese estado.[40] Se trata de un desarrollo normativo en el derecho de corporaciones en Puerto Rico que por más de cincuenta años ha emulado la normativa de Delaware.[41]

A.

---

[38] Id, p. 25.

[39] 132 D.P.R. 905, 915 (1993).

[40] Id, pp. 915-916, citando a Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 588 (1983), Hernández Agosto v. López Nieves, 114 D.P.R. 601, 607 (1983), Pueblo v. Zavala, 78 D.P.R. 484, 488 (1955) y Corretjer v. Tribunal de Distrito, 72 D.P.R. 754, 760 (1951).

[41] Lo anterior no significa que quedemos obligados por la normativa de Delaware, ya sea estatutaria o jurisprudencial. Al fin y al cabo, la interpretación de las leyes en nuestra jurisdicción le compete a este Tribunal. No obstante, en la medida en que dicha normativa es persuasiva e ilustradora, y se acople a nuestra realidad, la acogeremos.

Conforme al mandato legislativo y nuestra jurisprudencia, examinemos la jurisprudencia interpretativa de los tribunales de Delaware. Al hacerlo, nos detendremos no sólo en las decisiones del Tribunal Supremo de esa jurisdicción, sino en las de los "*Courts of Chancery*", que son tribunales de equidad a los cuales la Ley de Corporaciones de Delaware les encomienda atender los casos al amparo de su sección 273, análoga a nuestro artículo 9.03.[42] El Tribunal Supremo de Delaware ha analizado la figura de la empresa común en dos casos principales, J. Leo Johnson v. Carmer,[43] resuelto en 1959, y Warren v. Goldfinger, Inc., resuelto en 1980.[44] En J. Leo Jonhson v. Carmer, el Tribunal Supremo de Delaware ofreció la siguiente definición inicial:

> Generally, courts have not laid down any very certain definition of what constitutes a joint adventure, nor have they established very fixed or certain boundaries thereof, contenting themselves in determining whether the facts of a particular case constitute the relationship of joint adventure.
>
> […]
>
> A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise.

---

[42] La Ley General de Corporaciones de Delaware tampoco ofrece una definición estatutaria de la figura de la empresa común. Las expresiones del Tribunal Supremo de Delaware son escasas, aunque, como veremos, altamente ilustrativas. Por tanto, recurriremos a éstas en primera instancia. En segunda instancia, analizaremos algunas expresiones de los tribunales de equidad ("*Courts of Chancery*").

[43] 156 A.2d 499 (1959).

[44] 414 A.2d 507 (1980).

De lo anterior surgen dos asuntos de interés. En primer lugar, lo difícil que ha sido definir de manera concreta y precisa qué es una empresa común. En segundo lugar, que el Tribunal Supremo de Delaware emplea la misma definición que da el tratadista Rowley, fuente principal utilizada en Planned Credit. Ya hemos visto que, según Rowley, un "single business enterprise" o empresa dedicada a un solo negocio no necesariamente se limita únicamente a una sola transacción comercial.

En Warren v. Goldfinger Bros., Inc., el Tribunal Supremo de Delaware, consciente de la insuficiencia de la definición adoptada en J. Leo Johnson, adoptó unos criterios para determinar si se está ante una empresa común. Estos son:

(1) Una comunidad de intereses en el cumplimiento de un propósito común;
(2) Control o derecho de control conjunto;
(3) Un interés propietario conjunto sobre el asunto sustantivo;
(4) Un derecho a compartir las ganancias;
(5) Un deber de compartir las pérdidas en las que se pueda incurrir.[45]

Además del Tribunal Supremo del estado, los "Courts of Chancery" de Delaware han publicado opiniones de valor persuasivo en torno a la empresa común, interpretando y aplicando los pronunciamientos del Tribunal Supremo en J. Leo Johnson y Warren. Precisamente, muchos de los casos relacionados a esta figura se dan en el contexto de

---

[45] 414 A.2d 507, 509 (1980): "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained".

peticiones de disolución al amparo de la sección 273 de la ley de corporaciones de Delaware, análoga a nuestro artículo 9.03, en los cuales deben intervenir, por mandato legislativo, estos tribunales de equidad.

Al igual que en Puerto Rico, en Delaware la figura de la empresa común, originalmente, estaba fuera del modelo corporativo. En Sheppard v. Carey,[46] resuelto en 1969, el tribunal definió la empresa común no corporativa de la siguiente manera:

> A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business **adventure** for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking.[47]

De lo anterior surgen tres asuntos. En primer lugar, se descarta la definición estrecha de "una sola transacción" para caracterizar la empresa común y se repite el concepto de "la empresa de un solo negocio" ("single business enterprise"). En segundo lugar, se reafirma el que las definiciones iniciales de la figura de la empresa común se referían a ésta en su modalidad no corporativa, por lo cual resultan insuficientes para definir a la empresa común que asume la forma corporativa. Por último, la definición adoptada en Sheppard v. Carey reafirma que la característica principal de la empresa común es la

---

[46] 254 A.2d 260 (1969) (Énfasis suplido).

[47] *Id*, citando a 30 Am. Jur., §2 Joint Adventures.

precisión y especificidad respecto al tipo de gestión comercial que llevaría a cabo, en contraposición a una entidad que no tiene un objetivo específico en su operación. Esta descripción de la empresa común como una entidad con una vida dinámica y compleja, que trasciende la mera transacción única, ha sido desarrollada por los tribunales de equidad de Delaware.[48] De acuerdo a estas decisiones, la determinación de si una entidad particular es una empresa común dependerá de los hechos relacionados a su funcionamiento y no de que en el certificado de incorporación se haya mencionado que, en efecto, se estaba estableciendo una empresa común.[49] De igual forma, como hemos visto, lo que se requiere bajo nuestro artículo 9.03 es que la corporación se dedique a una empresa común, no que haya sido incorporada para esos fines.

En Wah Chang & Ref. Co. of Am. v. Cleveland Tungstan Inc.,[50] el *Court of Chancery* se enfrentó a un caso similar al de autos. Insistiendo en la naturaleza expedita del proceso de disolución bajo la sección 273, el tribunal reconoció que no había una definición estatutaria del concepto de empresa común y que la amplia definición

---

[48] In re Arthur Treacher's Fish & Chips, 1980 Del. Ch. LEXIS 489 (1980, no publicada). "In addition, joint ventures have historically been concerned with more than just one business transaction, being for the most part involved in the acquisition and running of a complex business". (Énfasis suplido). En este caso, se trataba de una empresa dedicada a la operación de varios restaurantes. El tribunal resolvió que se trataba de una empresa común.

[49] In re McKinney-Ringham Corp., 1998 Del. Ch. LEXIS 34 (1998), p. 6.

[50] 1996 Del. Ch. LEXIS 102.

ofrecida por el Tribunal Supremo de Delaware en J. Leo Johnson y Warren requería un análisis caso a caso para determinar si una entidad en particular es una empresa común.[51] En Wah Chang, la parte demandada alegó, de manera idéntica a la peticionaria en el caso de autos, que a la empresa cuya liquidación se solicitó no le aplicaba la sección 273 porque operaba de manera continua. En particular, igual que en nuestro caso, allí se argumentó que si se resolvía que una empresa de operación continua y compleja podía ser catalogada como una empresa común, virtualmente toda empresa compuesta por dos accionistas por partes iguales sería una empresa común, restándole eficacia a dicha figura.[52] El Tribunal de Wah Chang rechazó esa argumentación.[53]

---

[51] *Id*, pp. 9-10.

[52] "Respondents argue that every close corporation with only two shareholders might be classified as a joint venture if the Court does not require 'something more' when finding that parties created a joint venture". *Id*, p. 12. La parte demandada argumentó que ese 'algo más' era que la empresa se dedicara únicamente a un solo negocio ("single business"). En este caso, la corporación objeto de controversia se dedicaba a muchos negocios distintos ("several lines of business").

[53] Lo que es más, el tribunal propuso que una correcta definición del concepto de "single business entrreprise", incluso, no se limita a una empresa que se dedique a un solo tipo de negocio. Por el contrario, el *Court of Chancery* resolvió que una empresa común podía dedicarse a múltiples tipos de negocios ("several lines of business"). *Id*, pp. 13-14. Este fallo es consecuencia del rechazo expreso del tribunal a la definición de empresa común como algo limitado a una sola transacción ("one business transaction"):

> Respondent's attempt to persuade the Court
> that a joint venture may involve only one line of
> business fails. No authority supports such a

En conclusión, la normativa de Delaware en torno a lo que constituye una empresa común es consistente con nuestras expresiones en Planned Credit, según las clarificamos hoy. Aunque se trata de una figura que no permite una definición exacta, se requiere, como mínimo, una definición que cubra una gama amplia de gestiones comerciales.[54] Para ello debemos analizar cómo se ha atendido el proceso de disolución de estas empresas en Delaware y cómo ha evolucionado la figura de la empresa común, particularmente cuando se adopta una forma corporativa.

---

> limited and narrow definition of a joint venture. The statute itself does not define joint venture, and it would be inappropriate to rewrite the statute to include such a limitation. Although the definition in J. Leo Johnson states that a joint venture involves a 'single business enterprise', often joint ventures are highly intricate relationships that consist of 'more than just one business transaction' and often involve the acquisition and operation of a complex entity.

*Id*, p. 14. La lógica detrás de esta determinación es que, como la característica fundamental de la empresa común es que sus objetivos estén claramente definidos y precisados, no importa la naturaleza de ese objetivo, su complejidad o multiplicidad. Esta visión no es compartida de manera unánime por los *Courts of Chancery*. No obstante, aquellos que han requerido 'algo más' tampoco han adoptado definiciones tan estrictas como las propuestas aquí. Véase In re Coffee Associates, Inc., 1993 De. Ch. LEXIS 263 (1993).

[54] Por ejemplo, en In re Food Ingredients Int'l, Inc., 2010 De. Ch. LEXIS 233 (2010), se resolvió que una corporación cuya operación principal era la importación, procesamiento, venta y distribución de ingredientes y preparativos de comida era una empresa común.

B.

El Tribunal Supremo de Delaware ha sido parco en sus expresiones sobre el proceso de disolución establecido en la sección 273 de la ley de corporaciones de ese estado, que es análogo al proceso contemplado en el artículo 9.03 de nuestra Ley General de Corporaciones. Más bien, se ha dejado el desarrollo de la normativa, nuevamente, a los *Courts of Chancery*. En <u>Giuricich v. Emtrol Corp.</u>,[55] el alto foro de ese estado resolvió que el propósito de la sección 273 es "crear un remedio más liberal y rápidamente disponible en situaciones de tranques entre accionistas [en corporaciones compuestas por dos accionistas en partes iguales]".[56] El Tribunal resolvió que no hacía falta demostrar que no ordenar la disolución de la corporación causaría un daño irreparable. Es decir, pautó una regla general que favorece la aplicación de la sección 273 y la disolución de corporaciones que cumplan con sus requisitos.

Los *Courts of Chancery* de Delaware han suplido la normativa específica sobre la aplicación de la sección 273 dentro del marco de las expresiones amplias del Tribunal Supremo de esa jurisdicción. Como vimos, son cuatro los requisitos para disolver una corporación bajo la sección 273: que se trate de una corporación organizada con arreglo a las leyes de la jurisdicción, que ésta esté compuesta por dos accionistas por partes iguales, que se dedique al logro de una empresa común y que exista una desavenencia entre

---

[55] 449 A.2d 232 (1982).

[56] *Id*, p. 238.

los accionistas sobre la deseabilidad de descontinuar la empresa común. De éstos, los que más discusión han generado han sido los requisitos relacionados con los elementos esenciales de la empresa común y el control equitativo por los accionistas, en parte, porque es relativamente fácil demostrar que la corporación fue organizada con arreglo a las leyes de la jurisdicción y que hay desavenencia entre los accionistas.[57] También ha sido objeto de discusión el nivel de discreción que tiene un Tribunal para rehusar aplicar la sección 273, así como las defensas disponibles tanto a la corporación cuya disolución se solicita como al accionista que se opone a la disolución.[58]

La sección 273 de la ley de corporaciones de Delaware, al igual que nuestro artículo 9.03, dispone que, una vez

---

[57] Sobre este último, es evidente que si uno de los accionistas pide la disolución de la corporación y el otro se opone, existe una desavenencia entre éstos sobre la deseabilidad de continuar con la empresa común. Véase In re Venture Advisers, Inc., 1988 De. Ch. LEXIS 151 (1988).

[58] Cabe destacar que la interacción entre los requisitos de que la corporación se dedique a lograr una empresa común y que esté compuesta por dos accionistas por partes iguales ha desatado discusión en Delaware sobre cuál de éstos es el elemento fundamental para efectos de la sección 273. Las expresiones de algunos *Courts of Chancery* dan a entender que el elemento esencial de esta sección es que la corporación esté compuesta por dos accionistas por partes iguales y no que sea una empresa común. En ese sentido, se asemeja más a las situaciones que atendimos en Epstein. Véase In re Arthur Treacher's Fish & Chips, *supra*, pp. 11-12. Véase, además, In re Bay Surgical Servs., 2002 Del. Ch. LEXIS 158 (2002). En este último caso, si bien se insiste en que es insuficiente demostrar que se trata de una corporación compuesta por dos accionistas por partes iguales, sin más, -es decir, que hace falta que se dedique a lograr una empresa común-, el Tribunal apunta hacia una definición amplia de la empresa común e insiste en la importancia del control conjunto.

cumplidos los requisitos allí establecidos, el tribunal "podrá" ordenar la disolución de la corporación. Los tribunales de Delaware han interpretado que de esa forma se les otorga discreción para, en determinados casos, rechazar una petición de disolución.[59] Ahora bien, tal discreción es altamente limitada y estrecha.[60] Es decir, como regla general, una vez cumplidos los cuatro requisitos establecidos, lo que procede bajo la ley de Delaware es ordenar la disolución de la corporación. Además, esta discreción judicial está estrechamente atada a las defensas que pueden invocar el accionista demandado o la propia corporación que es eje de controversia, defensas que también están fuertemente limitadas.

En In re Magnolia Clinical Research, Inc.,[61] para evitar la disolución de la corporación, el accionista demandado levantó varias defensas muy similares a las presentadas en el caso de autos. En particular, alegó que el peticionario había presentado la solicitud de disolución para beneficiarse personalmente de unas oportunidades de negocio que le hubiesen correspondido a la corporación en

---

[59] Véase Fulk v.Wash Serv. Assocs., 2002 Del. Ch. LEXIS 78 (2002), p. 32; In re De. Bay Surgical Servs., *supra*, p. 7; In re Arthur Treacher's Fish & Chips, Inc., 386 A.2d 1162, 1166 (1978).

[60] En In re McKinney-Ringham Corp., *supra*, el *Court of Chancery* hizo énfasis en que la sección 273 establece un derecho estatutario a solicitar la disolución. *Id*, pp. 14-15. Por tanto, la discreción que ofrece la palabra "podrá" en cuanto a la facultad del tribunal de ordenar la disolución, debe construirse estrechamente ("very narrowly"). *Id*, p. 16.

[61] 2000 Del. Ch. LEXIS 5 (2000).

caso de que ésta no se disolviese. También alegó que el peticionario había faltado a su deber de fiducia para con la corporación. Ninguna de las defensas prosperó porque el accionista tenía a su haber la posibilidad de demandar al peticionario en daños por esas causas. El tribunal resolvió que las defensas alegadas no impedían la disolución corporativa bajo la sección 273. A igual conclusión se llegó en In re Data Processing Consultants, Ltd., donde se reconoció, además, que el fraude o la ilegalidad sí pueden derrotar la petición de disolución.[62] De igual forma, en In re McKinney-Ringham Corp., *supra*, se limitó el requerimiento de buena fe en la petición de disolución a que se tratara de una solicitud *bona fide*, es decir, que el peticionario verdaderamente quiera la disolución y no se utilice la petición como una táctica para obtener concesiones del demandado o molestarlo.[63]

En conclusión, vemos en la sección 273 de la Ley de Delaware un mecanismo expedito para la disolución de una corporación compuesta por dos accionistas por partes iguales. También podemos observar en la jurisprudencia y decisiones de los tribunales de esa jurisdicción una fuerte tendencia a favor de ampliar la definición de "empresa

---

[62] 1987 Del. Ch. LEXIS 519 (1987).

[63] "[The exercise of] [s]uch discretion is limited to a determination of whether or not a *bona fide* inability to agree exists between the two shareholders […], if it so finds, the petitioner is entitled to the relief provided by the statute […] [W]here the facts support a genuine dispute over the desirability of continuing the business enterprise as a joint venture, the inquiry ends". *Id*, pp. 16-18 (Énfasis suplido).

común" para cubrir, no solamente las entidades dedicadas a una sola transacción, sino las empresas continuas de uno o varios negocios. De igual forma, se desprende que una vez se presenta la petición de disolución y se cumplen los requisitos establecidos por ley, el tribunal debe ordenar la disolución de la corporación, excepto en casos de fraude o ilegalidad. Por ello, las defensas de una falta al deber de fiducia o que la intención del demandante sea aprovecharse personalmente de oportunidades de negocios que de otra manera le corresponderían a la corporación, aunque pueden dar base a reclamaciones civiles válidas, son impertinentes a la demanda de disolución y deben dilucidarse en un procedimiento civil ordinario e independiente.

## C.

Hasta aquí nos ha traído el repaso de la ley y la jurisprudencia del estado de Delaware que hemos hecho en cumplimiento con el mandato legislativo. Hemos constatado que el desarrollo de la "empresa común" en esa jurisdicción ha evolucionado de un origen informal en el que se asemejaba a la figura de la sociedad, a una versión de la figura jurídica de la corporación. Este desarrollo ha incidido en la definición de este concepto y de sus elementos constitutivos. A la luz de dicho desarrollo, la definición que podemos llamar "clásica" de la empresa común, además de servir de guía, resulta una definición <u>mínima</u> de esa figura en el contexto corporativo. En segundo lugar, es menester señalar que aun esa definición mínima

rechaza la visión estrecha de la empresa común como una entidad dedicada únicamente a lograr una sola transacción comercial.

Examinemos ahora brevemente cómo los tratadistas del derecho de corporaciones norteamericano han atendido esta figura, tanto en su versión no corporativa como en la corporativa. El tratadista Fletcher limita su discusión a la versión no corporativa de la empresa común. Lo que es más, establece que ésta es incompatible con la corporación.[64] No obstante, aun en el marco de esta modalidad limitada de la empresa común, Fletcher no la limita a "una sola transacción", sino que la describe como una "empresa única".[65] Otros tratadistas reconocen que, si bien la figura de la empresa común era incompatible en sus orígenes con la forma corporativa, eso ha cambiado:

> A rather modern device is a joint venture whose members are two or more business enterprises, corporate or otherwise. Many of these have been in the oil, chemical, electronic, and atomic fields. The resulting enterprise – although loosely called a joint venture- might be incorporated. In such a case the resulting enterprise is a corporation, governed by corporation law, called a **'joint venture corporation'**.[66]

O'Neal y Thompson discuten este desarrollo corporativo de la figura de la empresa común. Al igual que los

---

[64] Fletcher Cyclopedia Corporations, Vol. 1, § 23, p. 40 ("unincorporated business"); Vol. 8, § 3997.10, p. 349 "[A] joint venture may not be carried on by individuals through a corporate form; the two forms of business are mutually exclusive".

[65] ("Single enterprise"), *Id,* Vol. 1, § 23 p. 40.

[66] H.G. Henn & J. R. Alexander, Laws of Corporations, 3rd ed, West, St. Paul, Minn, 1983, p. 108. (Énfasis suplido).

tratadistas Henn y Alexander, éstos explican que el propósito de la empresa común corporativa originalmente era el permitir que una persona natural y una persona jurídica pudieran embarcarse en una actividad comercial específica de manera conjunta.[67] También sirvió para permitir que se pudiesen llevar a cabo proyectos que conllevasen grandes inversiones así como riesgos elevados de pérdidas y fracaso. En estos casos, se recurría a esta figura como mecanismo para compartir gastos y distribuir el riesgo entre los participantes.[68] En particular, O'Neal y Thompson hacen hincapié en la diferencia entre la empresa común no corporativa y aquella que adopta la forma de corporación:

> [T]he term 'joint venture' is somewhat misleading because the operations have a permanency and are conducted with a formality not generally associated with joint ventures as that term is often used in the context of unincorporated business associations.[69]

Finalmente, O'Neal y Thompson explican la interacción entre la empresa común, la transacción única y la empresa de un solo negocio:

> A joint venture is usually said to be limited to a single transaction or a series of transactions; but, if the undertaking on which the joint adventurers embark is an extensive one, the venture may continue for a number of years.[70]

---

[67] F. O'Neal & R. B. Thompspon, <u>O'Neal and Thompson's Close Corporations and LLCs</u>, Vol. I, § 1:7, West, 2010, p. 1-22. Véase H.G. Henn & J. R. Alexander, *Op.Cit.*, p. 108.

[68] F. O'Neal & R. B. Thompspon, *Op.Cit*, p. 1-23.

[69] *Id*, pp. 1-23 a 1-24. En este sentido, nos dicen los tratadistas, una empresa común no incorporada se asemeja a una sociedad, tal y como resolvimos en <u>Planned Credit</u>. *Id*, n. 13.

[70] *Id*, n. 13 (Énfasis suplido).

Es decir, estos tratadistas descartan también la visión estrecha de la empresa común como una entidad de naturaleza sencilla que únicamente se dedica a una sola transacción comercial y que conlleva, necesariamente, una duración ínfima.

IV.

A.

Ante los desarrollos normativos y doctrinales que se han producido desde nuestra decisión en Planned Credit, particularmente la adopción de la Ley General de Corporaciones de 1995, venimos obligados a profundizar en nuestra interpretación de la figura de la empresa común, ahora en su modalidad corporativa. Por un lado, la definición de Planned Credit, según la hemos explicado en esta Opinión, resulta insuficiente para abarcar la totalidad de las entidades cubiertas por el artículo 9.03. Pero, por otro lado, constituye el mínimo sustantivo de dicha definición. Por tanto, resolvemos que, como mínimo, una empresa común es aquélla que se dedica a un solo negocio, que si buen puede tratarse de una sola transacción comercial, no necesariamente tiene que serlo. Más aún, el concepto de "un solo negocio" debe interpretarse de manera amplia y se refiere más bien a que la empresa tiene que dedicarse a un negocio específico y definido, independientemente de su complejidad o duración.

Para determinar si están ante una empresa común en el contexto particular del artículo 9.03 de la Ley General de

Corporaciones, los tribunales deberán analizar la situación a la luz de los siguientes factores:

(1) Si existe una comunidad de intereses en el cumplimiento de un propósito común;

(2) Si hay un control o derecho de control conjunto;

(3) Si hay un interés propietario conjunto sobre el asunto sustantivo, es decir, que ambos accionistas aporten, ya sea con su industria, capital o de alguna otra manera, al logro del fin común;

(4) Si existe el derecho a compartir las ganancias;

(5) Si existe el deber de compartir las pérdidas en las que se pueda incurrir.

Por otra parte, la clasificación de una corporación como empresa común no dependerá necesariamente de lo que disponga su certificado de incorporación. Por el contrario, se trata de una determinación de derecho que dependerá de la evidencia que se someta en el caso particular. Lo fundamental será si dicha corporación en realidad se <u>dedica</u> a una empresa común, no si se incorporó a esos fines. Dado que la definición que adoptamos hoy es amplia y general, la determinación de si una corporación en particular se dedica a lograr una empresa común requerirá un análisis caso a caso.

En la situación particular de una petición de disolución bajo el artículo 9.03, el elemento fundamental a considerar será si se trata de una corporación compuesta por dos accionistas por partes iguales. De ser así, se analizará de manera liberal si el objetivo comercial de la

entidad es el logro de una empresa común. Si este análisis lleva a concluir que no se está ante una empresa común, los tribunales de instancia deberán resolver la controversia al amparo de nuestras expresiones en Epstein. Si se concluye que, efectivamente, se trata de una empresa común, resolverán acorde al artículo 9.03 de la Ley General de Corporaciones.

B.

El artículo 9.03 establece los cuatro requisitos que deben cumplirse para disolver una corporación que se dedica al logro de una empresa común. Una vez se cerciore que la corporación cuya disolución se solicita efectivamente es una empresa común y que se cumplen los demás requisitos, el tribunal ordenará la disolución de la entidad corporativa. La discreción de los tribunales para negarse a dictar dicha orden es extremadamente limitada. Si la parte demandada, ya sea el otro accionista o la propia corporación, reclama que el accionista peticionario ha faltado a sus deberes de fiducia, que responde en daños ante la corporación o incluso que solicita la disolución para adelantar sus propios intereses comerciales, ello será impertinente al proceso bajo el artículo 9.03. El Tribunal de Primera Instancia solamente deberá asegurarse que la solicitud de disolución sea *bona fide*, es decir, que realmente se pretenda la disolución.[71] Una vez llega a esa conclusión, si

---

[71] De igual forma, no procederá la disolución si se demuestra la existencia de fraude o alguna otra ilegalidad.

se cumplen los demás elementos del artículo 9.03, el tribunal ordenará la disolución de la corporación.

En el caso de autos, no hay controversia de que PGD es una corporación organizada con arreglo a las leyes de Puerto Rico y está compuesta por dos accionistas, titulares cada uno del 50 por ciento de las acciones. De igual forma, no hay controversia en cuanto al hecho de la desavenencia entre los accionistas; la causa de la misma es inmaterial. Además, no hay controversia en cuanto a que el peticionario es sincero en su deseo de disolver la corporación de la que es accionista. Finalmente, tampoco hay controversia de que PGD se dedica únicamente a la venta y distribución de medicamentos genéricos. Es decir, es una corporación dedicada a lograr una empresa común.

Al no haber controversia real sobre los hechos materiales, entiéndase, sobre los elementos dispuestos por el artículo 9.03 de la Ley General de Corporaciones, lo que corresponde es ordenar la disolución de la corporación demandada y continuar con el procedimiento establecido en dicho artículo. Por eso, no erró el Tribunal de Apelaciones al revocar al foro de instancia y dictar sentencia sumaria disolviendo la corporación.[72]

---

[72] La Regla 36.1 de Procedimiento Civil de 2009 permite a la parte reclamante en una demanda solicitar que se dicte sentencia sumaria a su favor sobre la totalidad o cualquier parte de la reclamación. 32 L.P.R.A. Ap. V R. 36.1; véase Ramos Pérez v. Univisión, 2010 T.S.P.R. 15, p.8. La sentencia sumaria es un mecanismo procesal disponible para resolver controversias en donde no se requiere la celebración de un juicio. Id. La parte que promueve la sentencia sumaria debe establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún

Por las razones anteriormente expuestas, se confirma la Sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de procedimientos compatibles con esta Opinión.

Se dictará sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

---

hecho material. Por su parte, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable. *Id.* Además, la controversia sobre el hecho material tiene que ser real. Es decir, cualquier duda no es suficiente para derrotar una moción de sentencia sumaria.

La parte demandante puede prevalecer por la vía de sentencia sumaria "si presenta prueba incontrovertida sobre todos los elementos indispensables de su causa de acción". *Id.*, p. 11 (Énfasis suplido). En cambio, la parte demandada puede derrotar la moción de tres maneras diferentes: (1) si establece una controversia real de hechos sobre uno de los elementos de la causa de acción de la parte demandante; (2) si presenta prueba que apoye una defensa afirmativa, o (3) si presenta prueba que establezca una controversia sobre la credibilidad de los testimonios jurados que presentó la parte demandante.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José C. Lloréns, *et al.*
        Recurridos

              v.                                    *Certiorari*

Rafael Arribas, Jr., *et al.*          CC-2009-497
        Peticionarios

Pharmaceutical    Developers,
Inc.
      Parte Interventora
          Peticionaria


                        *SENTENCIA*

        En San Juan, Puerto Rico, a 20 de diciembre de 2011.

        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la Sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma compatible con esta Opinión.

        Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión disidente a la cual se une el Juez Asociado señor Feliberti Cintrón. La Jueza Asociada señora Pabón Charneco no interviene.


                        Larissa Ortiz Modestti
                Secretaria del Tribunal Supremo, Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José C. Lloréns, *et. al.*<br><br>Recurridos<br><br>v.<br><br>Rafael Arribas, Jr., *et. al.*<br><br>Peticionarios<br><br>Pharmaceutical Developers, Inc.<br><br>Parte Interventora Peticionaria | CC-2009-497 |

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se une el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 20 de diciembre de 2011.

Entiendo que la definición de *joint venture* que hoy acoge la mayoría de este Tribunal trastoca el esquema de disolución de corporaciones que dispuso la Ley General de Corporaciones de 1995, Ley 144-1995, aplicable a este caso. Por eso, disiento respetuosamente.

Darle al término *joint venture* o empresa común el amplio significado que propone la mayoría de este Tribunal tiene el efecto de hacer aplicable el procedimiento de disolución expedito que proveía el Art. 9.03, 14 L.P.R.A. sec. 3003, a

cualquier corporación cuya titularidad recaiga en dos accionistas en partes iguales. El Art. 9.03, supra, era una excepción y como tal, debe reservarse para casos excepcionales. Debe limitarse a aquellas empresas cuyas operaciones no tengan la intención de ser continuas.

I

Pharmaceutical Generic Developers, Inc. (PGD) es una corporación regular con fines de lucro que se registró en el Departamento de Estado de Puerto Rico el 21 de abril de 1998. La corporación se dedica a la venta de productos farmacéuticos genéricos. Desde sus inicios contó con los señores José C. Lloréns y Rafael Arribas como sus dos únicos accionistas.

Al cabo de algunos años, afloraron diferencias entre ambos. Esa situación desembocó en que el Sr. Lloréns renunciara como oficial y director de PGD. Desde entonces no se han celebrado juntas de accionistas para elegir nuevos directores, por lo que el Sr. Arribas ha estado en control de la junta de directores desde entonces.

El 2 de agosto de 2006 el Sr. Lloréns solicitó la disolución de la corporación ante el Tribunal de Primera Instancia, al amparo del Art. 9.03 de la Ley General de Corporaciones de 1995, supra. Este artículo provee un procedimiento de disolución expedito para las empresas comunes que pertenezcan a dos accionistas en partes iguales.

Oportunamente, el Sr. Arribas se opuso a la disolución. Argumentó que procedía la desestimación de la demanda porque PGD no es una empresa común y, por consiguiente, la demanda no justificaba la concesión de un remedio. Mientras, PGD solicitó intervenir en el proceso.

Luego de varios trámites procesales, y oposiciones de ambas partes a los escritos de la otra, el 16 de septiembre de 2008 el Tribunal de Primera Instancia emitió una resolución en la que, a pesar de que descartó la aplicación del Art. 9.03, supra, por entender que PGD no era una empresa común, se negó a desestimar la demanda. Entendió meritorio dilucidar ciertos hechos que estaban en controversia ante la posibilidad de que existiera un remedio en la ley o en los principios de equidad que atendieran los reclamos del Sr. Lloréns.

Inconformes, ambas partes presentaron recursos de certiorari ante el Tribunal de Apelaciones. El Sr. Lloréns señaló que el Tribunal de Primera Instancia erró al no aplicar el Art. 9.03 de la Ley General de Corporaciones, supra. Por otro lado, el Sr. Arribas se mostró conforme con la determinación de inaplicabilidad de esa disposición porque alega que PGD no era una empresa común. No obstante, señaló que erró el tribunal al no desestimar la demanda porque el demandante no tiene una reclamación que justifique un remedio.

El Tribunal de Apelaciones revocó. Concluyó que el Art. 9.03, supra, era aplicable a PGD, amparándose en la evolución que ha tenido el concepto de *joint venture* en la jurisprudencia de Delaware, que favorece su aplicación a empresas que se dedican a más de una sola transacción.

Nuevamente en desacuerdo, el Sr. Arribas y PGD comparecen ante nos mediante recurso de *certiorari*. Insisten en que el concepto de *joint venture* no abarca las operaciones de PGD. Oportunamente, el Sr. Lloréns se opuso a la expedición del auto. El 11 de diciembre de 2009 lo expedimos. La opinión mayoritaria confirma al Tribunal de Apelaciones.

## II-A

La Ley General de Corporaciones de Puerto Rico de 1995 atendía la disolución de las corporaciones en diferentes capítulos, en atención al tipo de corporación de que se tratara. Por ejemplo, el Capítulo 9, 14 L.P.R.A. secs. 3001 y ss, atendía la disolución de la corporación general; el Art. 14.17, 14 L.P.R.A. sec. 3217, aplicaba a la disolución de las corporaciones íntimas; y los Arts. 19.47 y 19.48, 14 L.P.R.A. secs. 3997 y 3998, versaban sobre la disolución de las corporaciones de responsabilidad limitada.

El Art. 9.03, _supra_, trataba sobre la disolución de las corporaciones de empresa común cuya titularidad recayera en dos accionistas en partes iguales[73]. Este artículo disponía:

Art. 9.03 Disolución de una corporación de empresa común de dos accionistas.

(a) Si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (joint venture), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y

---

[73] El Art. 9.03 de la Ley General de Corporaciones vigente, Ley 164-2009, es muy similar a su predecesor:
Sec. 3703. Disolución de una corporación de empresa común de dos accionistas
(a) Excepto que el certificado de incorporación o un acuerdo escrito entre los accionistas disponga otra cosa, si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (_joint venture_), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal empresa común y para disponer de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y disponer de los activos utilizados en tal empresa de acuerdo con el plan que ambos accionistas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la corporación queda disuelta. La petición deberá acompañarse con una copia del plan de descontinuación y distribución que se propone y una certificación que haga constar que copias de tal petición y plan se han remitido por escrito al otro accionista y a los directores y oficiales de la corporación. […]

disponer de los activos utilizados en tal empresa de acuerdo con el plan que ambos accionistas acuerden; o que, si no pudiesen ambos accionistas acordar dicho plan, la corporación queda disuelta. La petición deberá acompañarse con una copia del plan de descontinuación y distribución que se propone y una certificación que haga constar que copias de tal petición y plan se han remitido por escrito al otro accionista y a los directores y oficiales de la corporación.[…]

El estatuto no ofrecía una definición de lo que es una empresa común o *joint venture*. Sin embargo, atendimos ese concepto en <u>Planned Credit of P.R., Inc. v. Page</u>, 103 D.P.R. 245 (1975), antes de que se aprobara la Ley General de Corporaciones de 1995, <u>supra</u>. En ese caso señalamos que se trataba de "una operación limitada a una sola transacción". <u>Planned Credit of P.R., Inc. v. Page</u>, <u>supra</u>, pág. 251. **"No se trata de una asociación convenida para operaciones diversas y de naturaleza continua**, sino una con un fin específico y restringido". <u>Íd</u>. (Énfasis suplido.)

El profesor Carlos Díaz Olivo explica que el propósito del Art. 9.03, <u>supra</u>, es romper el tranque que pudiera existir cuando una empresa común tiene dos accionistas en partes iguales, y evitar así la necesidad del consentimiento unánime de los accionistas. C.E. Díaz Olivo, <u>Corporaciones</u>, Colombia, Publicaciones Puertorriqueñas, 2005, pág. 248. Define el término de empresa común en este contexto como

la realización de una operación comercial específica llevada a cabo por dos o más personas. Los empresarios para esta operación o actividad aportan dinero, propiedad, conocimientos o

servicios y comparten entre sí las ganancias y el riesgo de la gestión. La figura de la empresa común guarda gran similitud con la **sociedad,** con la diferencia de que ésta se organiza para **operar un negocio de forma continua**, mientras que **la empresa común lo hace para llevar a cabo una sola transacción o gestión comercial**. (Énfasis suplido.)

Díaz Olivo, op cit., págs. 248-249.

El Art. 9.03, supra, era homólogo a la Sec. 273 de la Ley General de Corporaciones de Delaware, 8 Del. C. 1953, según enmendada. Esta tampoco define lo que es un *joint venture*.

La aplicación que ha dado la jurisprudencia de Delaware a esta sección de su Ley General de Corporaciones se ha catalogado como "inconstante", en parte, por la ausencia en la ley de una definición de lo que es un *joint venture* o empresa común. 2-38 Delaware Corporation Law and Practice Sec. 38.04 (2010) [LEXIS].

Los orígenes del *joint venture* en Estados Unidos se encuentran en la jurisprudencia, no en la ley. Los primeros casos que mencionan el concepto de gestiones conjuntas de negocios en Estados Unidos datan del siglo XIX. S.A., Joint Venture or Partnership, 18 Fordham L. Rev. 114 (1949).

Hourquebie *et al.* v. Girard, 12 F. Cas. 593, 596 (1808), fue uno de esos casos pioneros. Utilizó el concepto para describir un acuerdo de negocios en que los participantes compartían los riesgos y las pérdidas de una inversión. Estaba claro que esa gestión de negocios finalizaría en cuanto terminara el asunto para el que se habían unido los

inversionistas, que no era una operación de carácter continuo. "[H]abía un interés conjunto en una sola gestión, que terminaría, y terminó, con la venta de los vinos". Hourquebie *et al.* v. Girard, supra, pág. 596. (Traducción nuestra.)

En Delaware, estado cuya legislación corporativa ha copiado nuestra jurisdicción desde 1956, se comenzó a mencionar el concepto de "joint venture" en Wightman v. San Francisco Bay Toll-Bridge Co., 16 Del. Ch. 200 (1928). Aunque la opinión de la Corte de Cancillería de Delaware (Court of Chancery of Delaware) -tribunal de primera instancia especializado en casos corporativos- no entró a definir qué era un *joint venture*, se refirió a una corporación que se creó específicamente para construir un puente de peaje. Nuevamente se trataba de una gestión de negocios particular, con un fin previsible.

A partir de ese momento continuó el uso del término para diferentes tipos de negocios con un fin específico y término previsible. Por ejemplo, la creación de una corporación cuyo propósito era obtener la concesión de una farmacia durante cinco años, Shore v. Union Drug Co., 18 Del. Ch. 74 (1931); y para el desarrollo de bienes raíces, como en Greer v. Moore, 19 Del. Ch. 281 (1933), y Garber v. Whittaker, 6 W.W. Harr. 272 (1934). En Greenbaum v. Keil, 30 Del. Ch. 425 (1948), se

aplicó el término a una corporación creada para comprar y desarrollar unos terrenos en particular.

No fue hasta 1950 que el Tribunal Supremo de Delaware definió *joint venture* o empresa común. En Hannigan v. Italo Petroleum Corp. of America, 45 Del. 593 (1950), ese foro catalogó el tipo de negocio en controversia como una especie de sociedad, creada para la consecución de una transacción de un solo negocio (*single business transaction*). El Tribunal Supremo de Delaware extrajo esas características del *joint venture* del Vol. 48 del Corpus Juris Secundum. Véase, Hannigan v. Italo Petroleum Corp. of America, supra, pág. 607.

En Pan Am. Trade & Inv. Corp. v. Commercial Metals Co., 33 Del. Ch. 425 (1953), la Corte de Cancillería amplió la definición. Precisó que *joint venture* es un tipo de negocio en que las partes involucradas combinan su propiedad, dinero, habilidades y conocimiento para generar ganancias. Para llegar a esa definición, la corte se fundamentó en casos de diferentes jurisdicciones de Estados Unidos, además del Corpus Juris Secundum, American Law Report y American Jurisprudence. Pan Am. Trade & Inv. Corp. v. Commercial Metals Co., supra, págs. 427-428.

Dos años más tarde, el Tribunal Supremo de Delaware validó esa definición. En Consolidated Fisheries Co. v. Consolidated Solubles Co., 35 Del. Ch. 125 (1955), se

recurrió nuevamente a fuentes secundarias de derecho para reiterar que en un *joint venture* las partes combinan su propiedad, dinero, esfuerzos y habilidades o conocimientos para llevar a cabo una transacción de un solo negocio (*single business transaction*). Ese mismo foro reiteró sus pronunciamientos en J. Leo Johnson, Inc. v. Dana E. Carmer, 156 A.2d 499 (Del. 1959). En ese caso también se descansó en jurisprudencia de diferentes estados.

Además de la definición ya provista en sus precedentes judiciales, el Tribunal Supremo de Delaware acogió en Warren v. Goldinger Bros., Inc., 414 A. 2d 507 (Del. 1980), cinco elementos por los que generalmente se reconoce un *joint venture,* para elaborar su definición. Estos elementos son: (1) la existencia de una comunidad de intereses para alcanzar un propósito común; (2) control conjunto o derecho conjunto; (3) interés propietario conjunto; (4) derecho a compartir las ganancias; y (5) una responsabilidad de compartir las pérdidas. Warren v. Goldinger Bros., Inc., íd., pág. 509. Al analizar la aplicación que la jurisprudencia de Delaware ha hecho de estos elementos, los tratadistas entienden que ha sido "inconstante" y "problemática". 2-38 Delaware Corporation Law and Practice, supra.

La opinion no publicada en In Re Arthur Treacher's Fish & Chips, 180 Del. Ch. LEXIS 489 (1980), adoptó la definición de *joint venture* elaborada en los precedentes judiciales de

la jurisdicción. Pero, además, añadió que históricamente el uso del concepto no se había limitado a empresas que realizaran una sola transacción, sino que se había aplicado a negocios que involucraban la adquisición y operación de negocios complejos. Para sustentar tal aseveración, el tribunal citó Consolidated Fisheries Co. v. Consolidated Solubles Co., supra.

Si bien es cierto que en Consolidated Fisheries Co. v. Consolidated Solubles Co., supra, se trataba de la construcción y operación de una planta para procesar los desechos de otra fábrica, el contrato establecía un término de diez años para la empresa. Consolidated Fisheries Co. v. Consolidated Solubles Co., supra, pág. 129. En contraste, In Re Arthur Treacher´s Fish & Chip, supra, trataba de una corporación que adquirió y operaba varios restaurantes, sin que se mencionara que el acuerdo entre las partes tuviera una terminación previsible. Al aplicar la figura del *joint venture* en este contexto, el tribunal determinó que para activar el procedimiento de disolución expedita de la Sec. 273 bastaba hacer una determinación *bona fide* sobre la inhabilidad de los accionistas para llegar a acuerdos.

Trece años después, en In Re Coffee Associates, 1993 Del. Ch. LEXIS 263 (1993), otra opinión no publicada, la Corte de Cancillería señaló que la mera intención de las partes en crear una comunidad de intereses no es suficiente

para que se constituya una empresa común pues, si fuera así, "cualquier corporación íntima en que los accionistas entren en un acuerdo podría ser una empresa común". In Re Coffee Associates, supra. (Traducción nuestra.) La cancillería desfavoreció esa interpretación.

Luego de ese razonamiento, la Corte de Cancillería de Delaware retomó el concepto de empresa común de In Re Arthur Treacher´s Fish & Chips, supra. En Wah Chang Smelting & Ref. Co. of Am. v. Cleveland Tungsten, 1996 Del. Ch. LEXIS 102 (1996), la corte reiteró que las empresas comunes no se tenían que limitar a una sola línea de negocios. Aplicó la figura a un acuerdo para construir y operar una planta para manufacturar productos de tungsteno. Sin embargo, el caso tampoco discutió nada acerca de la intención de las partes involucradas en operar el negocio de forma continua o perpetua. La corte aplicó la Sec. 273 y disolvió la corporación.

Los tratadistas entienden que la determinación de la Corte de Cancillería en Wah Chang Smelting & Ref. Co. of Am. v. Cleveland Tungsten, supra, estuvo influenciada por el hecho de que en los documentos corporativos uno de los accionistas se refería a la corporación como un *joint venture*. Aunque la Corte de Cancillería reconoció en In re McKinney-Ringham Corp., 1998 Del. Ch. LEXIS 34 (1998), que para aplicar el concepto no es requisito una designación

explícita de que se trata de un *joint venture*, los tratadistas entienden que la denominación como tal en los documentos de negocios es un factor "controlante" a la hora de su aplicación. Delaware Corporation Law and Practice, supra.

Si bien es cierto que en la jurisprudencia estudiada, la Corte de Cancillería de Delaware llegó a aplicar el concepto de *joint venture* a empresas con operaciones aparentemente continuas, no se consideró esa característica a profundidad. Sin embargo, para los tratadistas esa característica es una de las determinantes a la hora de identificar una empresa común.

La definición de empresa común que proveen los tratadistas resulta más armoniosa que la que desglosa la jurisprudencia de Delaware. Fletcher define la empresa común como una asociación de dos o más personas en una sola empresa para generar ganancias. "Los principios legales que gobiernan las sociedades generalmente gobiernan las empresas comunes, porque las empresas comunes son, esencialmente, sociedades para realizar una sola empresa". 1 Fletcher Cyclopedia of the Law of Corporations Sec. 23, págs. 40-41. (Traducción nuestra.)

Por su parte, Rowley indicó que la definición más promulgada de una empresa común es aquella en que dos o más personas buscan, conjuntamente, una ganancia de un negocio,

sin que haya propiamente una designación de sociedad o corporación. 2 <u>Rowley on Partnership</u> Sec. 52.2, pág. 464 (1960). La otra definición más citada, según Rowley, apunta a que es una asociación de dos o más personas para llevar a cabo una empresa de un solo negocio (*single business enterprise*). Añade que "frecuentemente se dice que una empresa común es un tipo de sociedad limitada, no en el sentido legal, sino en su alcance y **duración**". <u>Rowley on Partnership</u>, <u>op. cit.</u>, págs. 464 y 465. (Énfasis suplido y traducción nuestra.)

> La naturaleza de una empresa común es tal que raras veces existe por un período fijo de tiempo. Su objetivo no es realizar un negocio por un determinado número de meses o años, sino concluir de manera exitosa y rentable, **una transacción particular o una serie de transacciones**. Así, generalmente se sostiene que una empresa común **continúa hasta que se cumple su propósito o definitivamente se determina que su propósito no puede cumplirse**. (Énfasis suplido.)
>
> <u>Rowley on Partnership</u>, <u>op. cit.</u>, Sec. 52.36, pág. 509. (Traducción nuestra.)

Este tratadista añade que existe una excepción aparente al principio general de la duración limitada de las empresas comunes, que se recoge en un grupo de casos que contemplan empresas continuas, que terminan a voluntad de las partes luego de una notificación razonable. Sin embargo, el tratadista entiende que no existe tal excepción, sino que estos casos, sencillamente, **no tratan de *joint ventures* o empresas comunes**. "Propiamente clasificados y caracterizados,

estas no constituyen, sin embargo, una excepción. Estos negocios continuos deben considerarse como asociaciones y no como empresas comunes". Rowley on Partnership, op. cit., Sec. 52.36, pág. 510. (Traducción nuestra.)

Rowley no está solo en su apreciación sobre la exclusión de negocios perpetuos de la definición de empresa común. Esta postura también la avalan otros tratadistas. Henn y Alexander señalan que la empresa común se diferencia de otros tipos de negocios en que se trata de dos o más personas que se unen para llevar a cabo un negocio particular y se disuelve una vez finaliza ese negocio. Para ellos, una empresa común es un tipo de asociación temporera. H.G. Henn y J.R. Alexander, Laws of Corporations, 3ra ed., Minnesota, West Publishing, 1983, Sec. 49, pág. 105 y 106. Véase, además, H.G. Reuschlein y W.A. Gregory, Agency and Partnership, 1ra ed., EE.UU., West Publishing Co., 1979, pág. 442; J.W. Barlett, Venture Capital: Law, Business Strategies, Investment Planning, 1ra ed., EE.UU., John Wiley & Sons Inc., 1988, Sec. 3.5, pág. 38.

Como puede observarse, en un esfuerzo por lograr una definición satisfactoria de lo que es una empresa común, se denota una tendencia por compararla con la figura de la sociedad, con la que guarda muchas similitudes. Sin embargo, la figura del *joint venture* puede ir acompañada de una estructura corporativa. Esta tendencia no es nueva y las características del *joint venture* no tienen que alterarse por

su incorporación. En Delaware se ha visto esta combinación de figuras, al menos, desde 1928 en Wightman v. San Francisco Bay Toll-Bridge Co., supra.

Algunos tratadistas reconocen que la coexistencia de ambas figuras es confusa, por las diferencias en el grado de formalidad que conlleva cada una y las consecuencias sobre la responsabilidad de los socios, quienes pasan a ser accionistas cuando se opta por la incorporación. Incluso, reconocen que el uso del término corporación de empresa común puede resultar confuso, porque se utiliza para empresas cuya gestión de negocios se puede extender por muchos años. 1 O'Neal and Thompson's Close Corporations and LLCs: Law and Practice, Sec. 1:7. Véase, además, H.G. Henn y J.R. Alexander, op. cit., Sec. 50, pág. 108.

Sin embargo, para Fletcher la figura corporativa no excluye necesariamente la empresa común. "Una corporación y una empresa común pueden coexistir como dos entidades legales distintas, y bajo cada una, las partes pueden adquirir diferentes derechos y obligaciones." Fletcher Cyclopedia of the Law of Corporations, op. cit., Sec. 3997.10, págs. 347-48. (Traducción nuestra.)

Para Rowley, una vez se incorpora una empresa común, las partes se convierten en accionistas u oficiales de la corporación y la relación debe regirse por la ley de

corporaciones aplicable. Rowley on Partnership, op. cit., Sec. 52.36, pág. 510.

O'Neal y Thompson añaden que una empresa común es un tipo de corporación íntima. Es decir, es una empresa que tiene pocos accionistas, quienes usualmente no planean vender sus acciones a personas extrañas a la corporación, se consideran a sí mismos como socios en una empresa de alcance limitado y usualmente interesan desviarse del patrón de administración corporativa tradicional. O'Neal and Thompson's Close Corporations and LLCs: Law and Practice, op. cit.

Ante este panorama, podemos resumir que una empresa común es un negocio en el que dos o más personas jurídicas combinan su propiedad, dinero, esfuerzos, habilidades y conocimientos para llevar a cabo una gestión de negocios, cuya complejidad puede acarrear más de una transacción, pero que no tiene la intención de operar de forma continua, sino hasta que culmine la gestión de negocios para la que se unieron.

B

El Capítulo 14 de la Ley General de Corporaciones de 1995, 14 L.P.R.A. secs. 9.01 y ss., sobre la venta de activos y disolución, proveía otro mecanismo para poner fin a las corporaciones regulares. Se trata del Art. 9.05, 14 L.P.R.A. sec. 3005. En ese artículo, la junta de directores de la corporación era el organismo que iniciaba el proceso de disolución con la aprobación de una resolución por parte de la

mayoría absoluta de sus integrantes. Los accionistas tenían que aprobar esa determinación posteriormente.

La Ley General de Corporaciones de 1995 no contenía una disposición específica que proveyera para la disolución de la corporación a petición de alguno de los accionistas por encontrarse la entidad en una situación de tranque. Díaz Olivo, op cit., pág. 246.

Pero, aparte de la disolución, la Ley General de Corporaciones daba a los tribunales otros poderes para manejar situaciones de tranque entre accionistas de una corporación regular. El Art. 7.16, 14 L.P.R.A. sec. 2916, disponía:

> **Artículo 7.16 Nombramiento de administrador judicial o síndico de una corporación en caso de empate o por otra causa**
>
> A. A petición de cualquier accionista, el Tribunal de Primera Instancia (Sala Superior) podrá nombrar a una o más personas como administrador o administradores judiciales y, si la corporación está insolvente, como síndico o síndicos, de cualquier corporación, cuando:
>
>    1. En cualquier reunión de elecciones de directores haya un empate entre los accionistas de manera que no se puedan elegir los sucesores de los directores cuyos términos han vencido o vencieran antes de la elección de sus sucesores; o
>
>    2. Los asuntos de la corporación estén sufriendo daños irreparables o estén bajo amenaza de sufrir los mismos debido al empate entre los directores en cuanto a la administración de los asuntos de la corporación de que no se pudiera obtener la votación necesaria para actuar de parte de la junta de directores y los accionistas no pueden poner fin al empate; o

3. La corporación haya abandonado sus negocios y no haya tomado las medidas necesarias para disolver, liquidar o distribuir sus activos dentro de un plazo razonable.

B. Un administrador judicial nombrado al amparo de este artículo estará autorizado para continuar con los asuntos de la corporación y no para **liquidar** los mismos ni para distribuir sus activos, **salvo cuando el tribunal ordene otra cosa** o en los casos que surjan según el párrafo (3) del inciso (A) de este artículo, o el párrafo (2) del inciso (A) del Artículo 14.15 de esta Ley. (Énfasis suplido)

Este artículo era idéntico a la Sec. 226 de la Ley General de Corporaciones de Delaware de 1953, según enmendada, 8 Del.C.1953, sec. 226. En <u>Giuricich v. Emtrol Corp.</u>, 449 A.2d 232 (Del. 1982), el Tribunal Supremo de Delaware ordenó la designación de un administrador al amparo de la sección equivalente a la 7.16(a)(1), <u>supra</u>. Había un tranque entre los únicos dos accionistas y uno de ellos controlaba la junta de directores. Como cada uno era dueño del 50% de las acciones no podían elegir una nueva junta.

El tribunal resolvió que fue un "abuso de discreción y error" de la Corte de Cancillería negar el nombramiento de un administrador bajo la Sec. 226(a)(1), <u>supra</u>. Concluyó que no aplicar esa sección era dejar sin remedio ni recurso al accionista que se quedaba sin representación en la junta de manera perpetua por la distribución de las acciones en partes iguales. "Este resultado no fue deseado bajo la Sec. 226(a)(1) y no debe permitirse". <u>Giuricich v. Emtrol Corp.</u>, <u>supra</u>, pág. 240. (Traducción nuestra.)

Así, se ordenó la designación de un administrador judicial imparcial y de probado trasfondo en negocios, cuyas actuaciones vinculaban a los oficiales y directores de la corporación. No podía ser accionista ni acreedor de la corporación. El tribunal le confirió poder para intervenir en decisiones en la junta de directores, llamar a reuniones de la junta de directores o de los accionistas. Giuricich v. Emtrol Corp., supra, pág. 240.

De igual modo, en Miller v. Miller, 2009 Del. Ch. LEXIS 16, una opinión no publicada, la Corte de Cancillería de Delaware asignó un administrador para otra corporación cuya titularidad se dividía, en partes iguales, entre dos hermanos y sus descendientes. No se ponían de acuerdo en cuanto a cuál debía ser el futuro de la corporación.

La Corte de Cancillería enumeró que los poderes del administrador serían resolver los tranques entre los directores, los tranques operacionales, participar como director en caso de que alguno de sus accionistas se quedara sin la debida representación de sus intereses en la junta de directores y resolver el tranque en torno al futuro de la corporación. Miller v. Miller, supra.

Por otro lado, nuestro Art. 7.16(b), supra, señalaba que el administrador designado por el tribunal estaba autorizado para continuar con los asuntos de la corporación, pero no para liquidarla ni distribuir sus activos. Sin embargo, en

ese mismo párrafo se establecía como excepción que el tribunal hubiere dado instrucciones en contrario.

El artículo encontraba su equivalente en la Sec. 226(b) de la Ley General de Corporaciones de Delaware. La Corte de Cancillería de ese estado ha validado la designación de un administrador para liquidar una corporación. En los casos Bentas v. Haseotes, 769 A. 2d 70 (Del. Ch. 2000) y 2003 Del. Ch. LEXIS 24, la Corte de Cancillería designó un administrador para que resolviera un tranque entre los directores. En el primero de los casos, el 769 A. 2d 70, instruyó al administrador que explorara todas las alternativas que pudieran resultar en una solución al tranque entre los accionistas. En la secuela de ese caso, 2003 Del. Ch. LEXIS 24, avaló el plan que presentó el administrador para subastar los activos, pero se consideraron alternativas como dividir la corporación y su venta.

C

El Art. 14.17 de la Ley General de Corporaciones de Puerto Rico de 1995, 14 L.P.R.A. sec. 3217, atendía la disolución de las corporaciones íntimas. Una corporación íntima es una corporación con 35 accionistas o menos, cuyas acciones son de transferencia limitada y no pueden venderse en oferta pública. Art. 14.03, 14 L.P.R.A. sec. 3203.

Bajo la Ley General de Corporaciones de 1995, el Tribunal de Primera Instancia podía ordenar la disolución de una

corporación íntima por un tranque entre los accionistas o directores sobre cómo conducir los negocios de la corporación. Art. 14.17, 14 L.P.R.A. sec. 3217. Sin embargo, antes de recurrirse a la disolución por esta razón, se debía ir primero a los remedios que proveen los Arts. 14.15 y 14.16, 14 L.P.R.A. secs. 3215 y 3216. Es decir, debía haber fracasado la designación de un administrador judicial, un síndico o director provisional.

Así pues, los tribunales deben ser "cautelosos y restrictivos" al ejercer su poder de disolución de una corporación íntima, porque esa acción representa la eliminación de un negocio y, por consiguiente, de su valor económico. Díaz Olivo, op cit., pág. 343.

Para que a una corporación le aplique el Capítulo 14 de la Ley General de Corporaciones, 14 L.P.R.A. sec. 3201 y ss. (corporaciones íntimas), tenía que hacer constar en su certificado de incorporación que cumplía con los requisitos y su interés de que se le considerara como corporación íntima. Arts. 14.01 y 14.03, 14 L.P.R.A. secs. 3201 y 3203.

### III

Una ley debe interpretarse considerando todas sus partes, como conjunto, y no tomando aisladamente sus párrafos, secciones o incisos. Cirino v. Fuentes, 91 D.P.R. 608, 616 (1964); Central Coloso v. Descartes, 74 D.P.R. 481, 485 (1953). El propósito de este principio fundamental de

interpretación estatuaria es, por un lado, aclarar ambigüedades y, por otro, hacer de la ley un todo armónico y efectivo. Así se procura que haya constancia y que todas las partes del estatuto tengan efecto. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Publicaciones J.T.S., 1987, pág. 315.

Cuando el legislador incluye unas palabras en un artículo de la ley, "esas palabras tienen su significado. Esas palabras revelan una intención manifiesta". Belaval v. Todd, 24 D.P.R. 26, 39 (1916). Debemos hacer todos los esfuerzos para darle efectividad a todo lo que el legislador expresa en una ley. Las palabras no están en la ley por mero azar o por improvisación, sino que están allí por alguna razón. R.E. Bernier y J.A. Cuevas Segarra, op cit., pág. 316.

La Ley General de Corporaciones no puede ser la excepción. Cada capítulo y cada artículo debe evaluarse en su contexto y en atención a los demás capítulos y artículos. Al mismo tiempo, cada palabra utilizada en la ley debe tener un significado que ayude a interpretar la ley como el todo armónico que es.

El Art. 9.03, supra, establece desde su título que trata sobre la disolución de una corporación de empresa común de dos accionistas. Si el legislador hubiera querido incluir dentro de ese artículo a cualquier corporación de dos accionistas, no hubiera especificado que el artículo es aplicable a una

"corporación de empresa común". Como las palabras que utiliza el legislador dentro de una ley están allí por alguna razón, es una conclusión inescapable que quería decir algo más. Tenemos que interpretar a qué se refería cuando especificó que aplica a corporaciones de empresa común.

La Ley General de Corporaciones de 1995, al igual que la Ley de Corporaciones de Delaware que tomó como modelo, está huérfana de una definición de lo que es una empresa común o *joint venture*. Sin embargo, este Tribunal ya había utilizado el término en Planned Credit of P.R., Inc. v. Page, supra. En esa ocasión, se utilizó el término para referirse a una operación limitada a una sola transacción, no a operaciones diversas ni de **naturaleza continua**. Planned Credit of P.R., Inc. v. Page, supra, págs. 250-251.

Esta definición se extrajo de tratadistas como Rowley quien, como vimos, también apunta a que un *joint venture* tiene una duración y alcance limitados. Rowley on Partnership, op. cit., Sec. 52.2, págs. 464 y 465. Este interpreta que la vigencia de una empresa común continúa hasta que cumple su propósito o se determina que no puede cumplirse. Rowley on Partnership, op. cit., Sec. 52.36, pág. 509. Más aún, enfatiza en que aquella jurisprudencia que trata a empresas de operaciones continuas como *joint ventures* es errada, ya que entiende que son más bien otras formas de hacer negocios. Para Rowley, el que un negocio sea por tiempo indefinido excluye la

posibilidad de un *joint venture*. <u>Rowley on Partnership</u>, <u>op. cit.</u>, Sec. 52.36, pág. 510.

En el aspecto de la no continuidad de la empresa común, la definición de <u>Planned Credit</u> es cónsona con la que habían adoptado la Corte de Cancillería y el Tribunal Supremo de Delaware hasta ese momento. La diferencia entre ambas estriba en si una empresa común se limita a una sola transacción o puede dedicarse a más de una. Esa diferencia aparente bien pudiera derivarse de las dificultades en la traducción de los conceptos.

La opinión mayoritaria concentra su análisis en que una empresa común se puede dedicar a más de una transacción, a lo que no nos oponemos siempre y cuando las transacciones estén vinculadas a una misma gestión de negocios. Incluso, esa gestión puede tomar muchos años en completarse.

Sin embargo, el análisis de la mayoría no profundiza sobre el aspecto de la intención de continuidad en las operaciones de la empresa. La jurisprudencia de Delaware tampoco se ha adentrado a analizar ese aspecto, sobre el que sí se han expresado claramente los tratadistas. Estos descartan las operaciones continuas como parte del concepto de empresa común.

El hecho de que una corporación de empresa común pueda dedicarse a un negocio que conlleve transacciones complejas, como ha interpretado la jurisprudencia de Delaware y hoy

adopta la mayoría, no puede significar que la empresa tenga la intención de realizar el mismo tipo de transacción de forma continua o perpetua. Un *joint venture* no puede tener la intención de operar por tiempo ilimitado aunque pueda llevar a cabo una gestión de negocio que conlleve años en completarse. Lo contrario la convertiría en corporación regular sin ninguna particularidad adicional, y vaciaría de significado la frase "empresa común" que dispuso el legislador en el Art. 9.03, <u>supra</u>.

De lo contrario, ¿para qué el legislador iba a especificar que el Art. 9.03, <u>supra</u>, aplicaba a las corporaciones de empresa común, si quería incluir a todas las corporaciones compuestas por dos accionistas con participaciones iguales? Ese significado ignora la intención manifiesta del legislador.

Por estas razones opino que la definición que debemos dar al término *joint venture* hoy día no tiene que distanciarse de <u>Planned Credit</u> en el aspecto de la no continuidad del negocio. Es una sola gestión de negocios, cuya complejidad puede abarcar más de una transacción, mientras estén interrelacionadas, **pero que no tiene el propósito de ser una operación continua**. La empresa tiene que culminar cuando finalice la gestión que se acordó entre las partes.

Somos conscientes de que el Informe de la Comisión de Reforma Gubernamental del Proyecto del Senado 1122, que

produjo eventualmente la Ley General de Corporaciones de 1995, instruye a que se utilicen los preceptos y las normas que haya desarrollado la jurisprudencia del estado de Delaware alrededor de su Ley General de Corporaciones. Comisión de Reformas Gubernamentales del Senado de Puerto Rico, Informe sobre el P. del S. 1122, p. 9. El mandato del legislador es que utilicemos el desarrollo de la Ley General de Corporaciones de Delaware como **guía.** Sin embargo, la jurisprudencia de Delaware no nos ofrece mucha luz para analizar los hechos de este caso, pues no ha analizado el aspecto de la continuidad del negocio. En contraste, nuestra jurisprudencia sí lo hizo en Planned Credit, caso que sí nos ofrece luz al respecto. No vemos razón para distanciarnos de esa definición.

PGD es una corporación que se dedica a la venta y distribución de productos genéricos. De ninguna parte del expediente surge que sus accionistas tenían la intención de finalizar operaciones con la consecución de algún evento. Sus operaciones consistían en un mismo tipo de transacción, de forma continua. Eso la excluye del concepto de corporación de empresa común.

La opinión del Tribunal reconoce que el Art. 9.03, supra, no debe aplicar a toda corporación compuesta por dos accionistas. Sin embargo, la interpretación que hace de lo que es una empresa común tiene como resultado lo que quiere

evitar. Ello se evidencia en que la mayoría aplicaría esa disposición al caso de Epstein v. F.&F. Mortgage Corp., 106 D.P.R. 211 (1977), que trataba sobre dos corporaciones regulares de operaciones continuas, dedicadas a la industria hipotecaria. En ese caso, este Foro accedió a la disolución bajo el principio de equidad, pues las diferencias irreconciliables entre los dos únicos accionistas amenazaban con llevar las corporaciones al fracaso.

Además, la opinión mayoritaria da a entender que el hecho de que se incluyera el concepto de *joint venture* en el Art. 9.03, supra, equivale a codificar la figura y darle forma corporativa. Entendemos que esa interpretación es equivocada. El concepto de *joint venture* nació mucho antes de que se aprobara la Ley General de Corporaciones de Delaware de 1953. Lo que hizo el estatuto fue integrar a su legislación corporativa el concepto que ya habían desarrollado los tribunales. Si el legislador hubiera querido alterar el significado de empresa común que había elaborado la jurisprudencia, hubiera provisto una definición para ello dentro del mismo estatuto.

Más aún, las empresas comunes existían y seguirán existiendo más allá de la Ley General de Corporaciones. El hecho de que se incluya dentro de la Ley General de Corporaciones para atender el caso particular de las empresas comunes que adquieren forma corporativa no excluye que puedan

existir *joint ventures* bajo otras formas de hacer negocios, como una sociedad, por ejemplo.

La mayoría distingue entre la empresa común y la corporación de empresa común, como si ello cambiara la esencia del *joint venture*. La única diferencia que la incorporación produce es dotar al negocio de los beneficios que provee la ley corporativa a sus accionistas, como los límites en la responsabilidad que asumen por sus negocios. Precisamente, es ese uno de los aspectos principales que discuten los tratadistas al analizar la combinación de ambas figuras.

La opinión del Tribunal añade que la Ley General de Corporaciones que existía cuando se resolvió Planned Credit no contemplaba que la empresa común pudiera tener forma corporativa. Sin embargo, el mero hecho de que se considerara aplicar la figura a ese caso es evidencia de que sí era posible, aunque no estuviera expresamente dispuesto en la ley.

Por último, la opinión mayoritaria entiende que la definición que adoptamos en Planned Credit of P.R. no nos ata porque el caso se resolvió antes de que se aprobara la Ley General de Corporaciones de 1995. Sin embargo, en el aspecto del tiempo limitado de operación de la empresa común, esa definición es cónsona con la que todavía avalan los tratadistas expertos en la materia.

Una interpretación integrada de la Ley General de Corporaciones de 1995 también nos lleva al mismo resultado.

Además de que, como mencionamos, interpretar el *joint venture* como una empresa con operaciones continuas vaciaría esa frase de significado en el Art. 9.03, supra, debemos mirar a los otros artículos de la ley.

El Capítulo 14, supra, permite la disolución de una corporación íntima en caso de tranque, pero solo luego de un procedimiento en el que se hagan unos esfuerzos por salvarla. Es decir, la disolución no es la primera alternativa para esos casos.

El Art. 7.16, supra, permite confeccionar un remedio similar al de las corporaciones íntimas en caso de que haya un tranque en una corporación regular, que pertenezca a dos accionistas en partes iguales. Ese artículo faculta al Tribunal de Primera Instancia a designar un administrador judicial si algún accionista lo solicita. Ese administrador puede, incluso, asumir la función de un síndico y liquidar la corporación si el Tribunal de Primera Instancia le confiere ese poder expresamente. Aunque disolver y liquidar son conceptos distintos, en este tipo de caso se llegaría a un resultado parecido pues la disolución de la corporación conlleva su liquidación.

Si, luego de descartar la aplicación del Art. 9.03, supra, para empresas comunes, analizamos el procedimiento para disolver una corporación íntima y la alternativa del Art. 7.16, supra, para la corporación regular, vemos que la Ley

General de Corporaciones no obliga a dos accionistas en partes iguales a permanecer en un negocio continuo en contra de su voluntad. Para ellos también existen remedios.

Sin embargo, ese remedio no puede ser la disolución expedita como primera alternativa. La ley establece unos mecanismos que intentan resolver el tranque primero y salvar la corporación. Esta interpretación, entendemos, es más cónsona con el espíritu de la ley. Me parece que el que los tribunales disuelvan de forma expedita corporaciones productivas, que estimulan la economía, no ayuda a "promover la expansión del sector empresarial y agilizar el movimiento de capital en la economía", propósito expreso de la Ley General de Corporaciones de 1995, según su Exposición de Motivos.

Visto de esa forma, se hace evidente que el Art. 9.03, supra, para la disolución expedita de empresas comunes, es una excepción. No puede estar disponible para todas las corporaciones de dos accionistas que tienen la intención de operar de forma continua. Es una excepción que se reservó para empresas que, aunque conllevaran una gestión de negocios compleja compuesta de distintas transacciones, tenían un fin previsible con la llegada de algún evento previamente pactado, que conllevaría la finalización de esa gestión. Un tranque entre los dos accionistas únicos en partes iguales es

suficiente justificación para su disolución, pues de todas formas, la corporación tenía un fin previsible.

Sin embargo, para las corporaciones que tienen la intención de conllevar operaciones continuas se buscaron otras alternativas que procuraran por su supervivencia y la permanencia de su valor en la economía. Por ello, es que entiendo que la interpretación que hoy se le da al Art. 9.03, supra, trastoca el esquema de disolución de corporaciones que el legislador ordenó en la ley. Flexibiliza la disolución de corporaciones de operaciones continuas por parte de los tribunales, sin que se hagan mayores esfuerzos por subsanar los tranques entre los dos accionistas en partes iguales.

En el Art. 9.05, supra, hay un procedimiento para la disolución de las corporaciones regulares sin que intervenga un administrador o director designado por el tribunal. Sin embargo, aplica cuando media el consentimiento mayoritario de la junta de directores y de la mayoría de los accionistas, es decir, cuando la mayor parte de la estructura de poder de la corporación ya no interesa que esta continúe con vida. No aplica cuando los propietarios de la corporación están divididos en partes iguales en torno a la decisión de si debe disolverse o no. Permitir esto en el caso de dos accionistas propietarios en partes iguales, mediante la aplicación del Art. 9.03, supra, sería privilegiarlos sobre los demás casos de tranques entre accionistas, quienes tendrían que recurrir a

otros remedios de la ley por el mero hecho de que son más de dos.

De todos modos, como la corporación pertenece a dos accionistas en partes iguales, no podemos aplicar el Art. 9.05, _supra_, pues ante el tranque, nunca se alcanzaría la mayoría necesaria para la disolución que solicitó el Sr. Lloréns. Tampoco podemos aplicar los procedimientos de disolución para corporaciones íntimas porque PGD está registrada como una corporación regular.

Sin embargo, las partes no están huérfanas de remedio en la ley. Recordemos que la Regla 42.4 de Procedimiento Civil, 32 L.P.R.A. Ap. V, establece que "toda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones".

Así, en este caso es aplicable el Art. 7.16, _supra_, que permite al Tribunal de Primera Instancia confeccionar un remedio similar al de la disolución de las corporaciones íntimas de operaciones continuas. Es evidente que existe un tranque entre los accionistas sobre cuál debe ser el futuro de la corporación y actualmente uno de los dos accionistas no cuenta con la representación adecuada en la junta de directores. Incluso, el Sr. Lloréns alega que el Sr. Arribas se ha negado durante años a convocar reuniones de accionistas para elegir una nueva junta de directores.

Según el Art. 7.16, _supra_, si un accionista lo solicita, el Tribunal de Primera Instancia puede asignar un administrador judicial para que, entre otras cosas, intente resolver los tranques, convocar a una reunión de accionistas, mediar para que uno compre al otro su parte, y, de entenderse necesario, hasta puede liquidarse la corporación, previa autorización del tribunal, si fuere necesario.

Sin embargo, el Tribunal de Primera Instancia no está obligado a otorgar al administrador la capacidad para liquidar la corporación, si decide nombrarlo. Las facultades del administrador deben enumerarse expresamente y deben confeccionarse en atención al caso particular de la corporación para la que se solicite. Después de todo, la intervención de los tribunales en este proceso debe ser tan mínima como sea posible y ejercerse en el grado en que requiera alcanzar la meta de hacer justicia. _Giuricich v. Emtrol Corp._, _supra_, pág. 240.

IV

Por las razones expuestas, disiento respetuosamente. Revocaría la sentencia del Tribunal de Apelaciones y devolvería el caso al Tribunal de Primera Instancia para que acoja la petición de disolución al amparo del Art. 9.03 de la Ley General de Corporaciones de 1995, _supra_, como una solicitud para la asignación de un administrador judicial al amparo del Art. 7.16 de ese mismo estatuto, _supra_.

Conforme a ello, ordenaría que el tribunal haga una evaluación de los hechos y determine si el caso amerita la designación de un administrador judicial. De así entenderlo, el tribunal debería enumerar las responsabilidades que tendría el administrador, de acuerdo a las particularidades de este caso.


                        RAFAEL L. MARTÍNEZ TORRES
                             Juez Asociado